# GOLDEN STATE TRANSIT CORP. *v.* CITY OF LOS ANGELES

No. 84-1644.   Argued December 4, 1985—Decided April 1, 1986

BLACKMUN, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, WHITE, MARSHALL, POWELL, STEVENS, and O'CONNOR, JJ., joined.   REHNQUIST, J., filed a dissenting opinion, *post*, p. 620.

*Zachary D. Fasman* argued the cause for petitioner. With him on the briefs was *Clifton S. Elgarten.*

*John F. Haggerty* argued the cause and filed a brief for respondent.*

JUSTICE BLACKMUN delivered the opinion of the Court.

The city of Los Angeles, Cal., refused to renew Golden State Transit Corporation's taxicab franchise after the company's drivers went on strike. We are asked to decide whether, under *Machinists* v. *Wisconsin Employment Relations Comm'n*, 427 U. S. 132 (1976), the city's action is preempted by the National Labor Relations Act (NLRA), 29 U. S. C. § 151 *et seq.*

I

In 1980, Golden State, which operated taxicabs under the Yellow Cab name, applied to the city for a renewal of its operating franchise eventually scheduled to lapse on March 31, 1981. That franchise had first been acquired in 1977. On September 4, 1980, the city's Board of Transportation Commissioners recommended the renewal of Golden State's franchise—the largest, with approximately 400 cabs, of companies operating in Los Angeles—along with the franchises of 12 other taxi companies.

In October, while the franchise renewal application was pending, Golden State's labor contract with its drivers expired. The company and the drivers, represented by Local

*Peter G. Nash, Dixie L. Atwater,* and *Stephen A. Bokat* filed a brief for the Chamber of Commerce of the United States as *amicus curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed for the National League of Cities et al. by *Rex E. Lee, Benjamin W. Heineman, Jr., Carter G. Phillips, Benna Ruth Solomon,* and *Joyce Holmes Benjamin;* and for the National Institute of Municipal Law Officers by *George Agnost, Roy D. Bates, Benjamin L. Brown, J. Lamar Shelley, John W. Witt,* and *Roger F. Cutler.*

Briefs of *amici curiae* were filed for the National Labor Relations Board by *Acting Solicitor General Fried, Deputy Solicitor General Wallace, Bruce N. Kuhlik, Norton J. Come, Linda Sher,* and *Robert C. Bell, Jr.;* and for the American Federation of Labor and Congress of Industrial Organizations by *David Silberman* and *Laurence Gold.*

572 of the International Brotherhood of Teamsters, signed a short-term contract in order that operations would continue while negotiation and mediation proceeded. This interim contract was to expire at midnight February 10, 1981, the day before the City Council was scheduled to consider action on the franchise renewals.

On February 2, the Council's Transportation and Traffic Committee endorsed franchise renewals recommended by the Board of Transportation Commissioners. The Committee's report stated that Golden State and other companies were "in compliance with all terms and conditions of their franchise[s]." App. 39.

On February 11, the drivers struck Golden State, halting its operations. At the Council meeting that day, Teamster representatives argued against renewal of Golden State's franchise because of the pendency of the labor dispute. The Council postponed decision on Golden State's application until February 17, but, with possibly one exception, approved all other franchise renewal applications. At the February 17 meeting, when the union again opposed the renewal, the Council voted to extend Golden State's franchise from March 31 to April 30, but only if the Council expressly found, on or before March 27, that the extension was in the best interests of the city.

At its March 23 meeting, the Council held a short public hearing on whether it should grant the limited extension. By this time, the labor dispute and the franchise renewal issue had become clearly intertwined. The Teamsters opposed any extension of the Yellow Cab franchise, stating that such action would simply lengthen the strike and keep the drivers out of work. It preferred to see the franchise terminated, and to have the drivers seek jobs from Golden State's successor or from other franchise holders. As others spoke, the discussion turned to whether there was even a need for Yellow Cab, in light of the services performed by the other 12 franchised taxi companies. There were comments regarding

an excess of cabs; the city's policy at the time, however, was not to limit the number of taxi companies or the number of taxis in each fleet. *Id.*, at 81–82.

The strike was central to the discussion. One Council member charged Golden State with negotiating unreasonably, *id.*, at 71, while another accused the company of trying to "brea[k] the back of the union." *Id.*, at 66. The sympathies of the Council members who spoke lay with the union. But rather than defeat the renewal outright, the council reached a consensus for rejection of the extension with a possibility for reopening the issue if the parties settled their labor dispute before the franchise expired the following week. Four Council members endorsed this approach, and the Assistant City Attorney said that he clearly had informed the parties that this was the city's position. *Id.*, at 68. The Council President said: "I find that it will be very difficult to get this ordinance past (sic) to extend this franchise if the labor dispute is not settled by the end of this week." *Id.*, at 75. He added: "I just think that this kind of information should be put out in the open, so everybody understands it." *Ibid.* The Council, by a vote of 11 to 1, defeated the motion to extend the franchise and it expired by its terms on March 31.

## II

Golden State filed this action in the United States District Court for the Central District of California, alleging that the city's action was pre-empted by the NLRA and violated the company's rights to due process and equal protection. It sought declaratory and injunctive relief and damages. The District Court found that it was "undisputed that the sole basis for refusing to extend [Golden State's] franchise was its labor dispute with its Teamster drivers," 520 F. Supp. 191, 193 (1981); that the Council had "threaten[ed] to allow Yellow Cab's franchise to terminate unless it entered into a collective bargaining agreement with the Teamsters," *id.*, at 194; and that the Council had denied the company an essential weapon

of economic strength—the ability to wait out a strike. On the basis of the pre-emption claim, the District Court granted Golden State's motion for a preliminary injunction to preserve the franchise. *Ibid.* The Court of Appeals for the Ninth Circuit found "ample evidence" in the record to support the District Court's finding, but nevertheless vacated the injunction. 686 F. 2d 758, 759, 762 (1982). The court reasoned that Golden State had little chance of prevailing on its pre-emption claim or on the other grounds it asserted. This Court denied Golden State's petition for certiorari. 459 U. S. 1105 (1983).

Following litigation on unrelated issues,[1] and with the company having abandoned its equal protection claim, the District Court granted summary judgment for the city. App. to Pet. for Cert. 11a. Golden State had not moved for summary judgment in its favor. The Court of Appeals affirmed, holding that the city's action was not pre-empted. 754 F. 2d 830 (1985). The court felt that, when the activity regulated is only a peripheral or incidental concern of labor policy, traditional municipal regulation is not pre-empted. The court found nothing in the record to suggest that the city's nonrenewal decision "was not concerned with transportation." *Id.*, at 833. Moreover, to avoid undue restriction of local regulation, "only actions seeking to directly alter the substantive outcome of a labor dispute should be pre-empted." Here, the city had not attempted to dictate the terms of the agreement, but had "merely insisted upon resolution of the dispute as a condition to franchise renewal." *Ibid.* The Court of Appeals also rejected Golden State's due

---

[1] Antitrust claims were asserted in a second amended complaint filed by Golden State. The District Court granted the city partial summary judgment as to these claims, 563 F. Supp. 169 (CD Cal. 1983), and the Court of Appeals affirmed. 726 F. 2d 1430 (CA9 1984). We again denied certiorari. 471 U. S. 1003 (1985).

process claim. *Id.*, at 833–834.[2] Because of our concern about the propriety of the grant of summary judgment for the city in this factual and labor context, we granted certiorari. 472 U. S. 1016 (1985).[3]

### III

### A

Last Term, in *Metropolitan Life Ins. Co.* v. *Massachusetts,* 471 U. S. 724 (1985), we again noted: "The Court has articulated two distinct NLRA pre-emption principles." *Id.*, at 748. See also *Belknap, Inc.* v. *Hale,* 463 U. S. 491, 498–499 (1983). The first, the so-called *Garmon* pre-emption, see *San Diego Building Trades Council* v. *Garmon,* 359 U. S. 236 (1959), prohibits States from regulating "activity that the NLRA protects, prohibits, or arguably protects or prohibits." *Wisconsin Dept. of Industry* v. *Gould Inc., ante,* at 286. The *Garmon* rule is intended to preclude state interference with the National Labor Relations Board's interpretation and active enforcement of the "integrated scheme of regulation" established by the NLRA.

---

[2] One judge concurred in the majority's due process analysis but otherwise concurred only in the judgment. As to pre-emption, he would have granted summary judgment for the city on the ground that Golden State had failed to provide evidence of the city's motive or of the economic impact on Golden State. 754 F. 2d, at 834.

[3] The city contends that the case is moot because the franchise, if renewed, would have expired on March 31, 1985. But if petitioner's franchise renewal had been granted in 1981, petitioner would have faced a renewal procedure in 1985 rather than the more onerous task of obtaining a franchise through competitive bidding. See Tr. of Oral Arg. 25–26. But for the nonrenewal in 1981, Golden State would be more likely to have an operating franchise now. At oral argument, counsel for Golden State said the company was ready to resume operations, even though it was in Chapter 11 bankruptcy. *Id.*, at 5. It therefore cannot be said that "[i]ntervening events have . . . 'irrevocably eradicated the effects of the alleged violation.'" *Los Angeles* v. *Lyons,* 461 U. S. 95, 101 (1983), quoting *County of Los Angeles* v. *Davis,* 440 U. S. 625, 631 (1979). We conclude, therefore, that the case is not moot.

*Ante,* at 289. See *Metropolitan Life Ins. Co.* v. *Massachusetts,* 471 U. S., at 748, and n. 26.

This case, however, concerns the second pre-emption principle, the so-called *Machinists* pre-emption.[4] See *Machinists* v. *Wisconsin Employment Relations Comm'n,* 427 U. S. 132 (1976). This precludes state and municipal regulation "concerning conduct that Congress intended to be unregulated." *Metropolitan Life Ins. Co.* v. *Massachusetts,* 471 U. S., at 749.[5] Although the labor-management relationship is structured by the NLRA, certain areas intentionally have been left "'to be controlled by the free play of economic forces.'" *Machinists,* 427 U. S., at 140, quoting *NLRB* v. *Nash-Finch Co.,* 404 U. S. 138, 144 (1971). The Court recognized in *Machinists* that "'Congress has been rather specific when it has come to outlaw particular economic weapons,'" 427 U. S., at 143, quoting *NLRB* v. *Insurance Agents,* 361 U. S. 477, 498 (1960), and that Congress' decision to prohibit certain forms of economic pressure while leaving others unregulated represents an intentional balance "'between the uncontrolled power of management and labor to further their respective interests.'" *Machinists,* 427 U. S., at 146, quoting *Teamsters* v. *Morton,* 377 U. S. 252, 258–259 (1964). States are therefore prohibited from imposing additional restrictions on economic weapons of self-help,

---

[4] We do not reach the question whether the city's action in this case is pre-empted under *Garmon,* because Golden State and its supporting *amici,* including the NLRB, rely exclusively on the *Machinists* doctrine, and we find their argument persuasive.

[5] Our pre-emption analysis is not affected by the fact that we are reviewing a city's actions rather than those of a State. See *Fisher* v. *Berkeley, ante,* at 265. And the fact that the city acted through franchise procedures rather than a court order or a general law also is irrelevant to our analysis. "[J]udicial concern has necessarily focused on the nature of the activities which the States have sought to regulate, rather than on the method of regulation adopted." *San Diego Building Trades Council* v. *Garmon,* 359 U. S. 236, 243 (1959). See *Wisconsin Dept. of Industry* v. *Gould Inc., ante,* p. 282.

such as strikes or lockouts, see 427 U. S., at 147, unless such restrictions presumably were contemplated by Congress. "Whether self-help economic activities are employed by employer or union, the crucial inquiry regarding pre-emption is the same: whether 'the exercise of plenary state authority to curtail or entirely prohibit self-help would frustrate effective implementation of the Act's processes.'" *Id.*, at 147–148, quoting *Railroad Trainmen* v. *Jacksonville Terminal Co.*, 394 U. S. 369, 380 (1969).

## B

There is no question that the Teamsters and Golden State employed permissible economic tactics. The drivers were entitled to strike—and to time the strike to coincide with the Council's decision—in an attempt to apply pressure on Golden State. See *NLRB* v. *Insurance Agents*, 361 U. S., at 491, 496. And Golden State was entirely justified in using its economic power to withstand the strike in an attempt to obtain bargaining concessions from the union. See *Belknap, Inc.* v. *Hale*, 463 U. S., at 493, 500 (employer has power to hire replacements during an economic strike); *American Ship Building Co.* v. *NLRB*, 380 U. S. 300, 318 (1965) (at bargaining impasse employer may use lockout solely to bring economic pressure on union).

The parties' resort to economic pressure was a legitimate part of their collective-bargaining process. *Machinists*, 427 U. S., at 144. But the bargaining process was thwarted when the city in effect imposed a positive durational limit on the exercise of economic self-help. The District Court found that the Council had conditioned the franchise on a settlement of the labor dispute by March 31. We agree with the Court of Appeals that this finding is amply supported by the record.[6] The city's insistence on a settlement is pre-empted

---

[6] The District Court's finding is supported by objective factors such as what the city—through the Council and the Assistant City Attorney—told the parties, and its schedule of Council meetings. At the meeting of March 23, 1981, four Council members without contradiction pointedly con-

if the city "'[entered] into the substantive aspects of the bargaining process to an extent Congress has not countenanced.'" *Machinists,* 427 U. S., at 149, quoting *NLRB* v. *Insurance Agents,* 361 U. S., at 498.

That such a condition—by a city or the National Labor Relations Board—contravenes congressional intent is demonstrated by the language of the NLRA and its legislative history. The NLRA requires an employer and a union to bargain in good faith, but it does not require them to reach agreement. § 8(d), as amended, 29 U. S. C. § 158(d) (duty to bargain in good faith "does not compel either party to agree to a proposal or require the making of a concession"); *NLRB* v. *Jones & Laughlin Steel Corp.,* 301 U. S. 1, 45 (1937) ("The theory of the Act is that free opportunity for negotiation . . . may bring about the adjustments and agreements which the Act in itself does not attempt to compel").

The Act leaves the bargaining process largely to the parties. See *H. K. Porter Co.* v. *NLRB,* 397 U. S. 99, 103 (1970). It does not purport to set any time limits on negotiations or economic struggle. Instead, the Act provides a framework for the negotiations; it "is concerned primarily with establishing an equitable process for determining terms and conditions of employment." *Metropolitan Life Ins. Co.* v. *Massachusetts,* 471 U. S., at 753. See also § 1, as amended, of the NLRA, 29 U. S. C. § 151 (Act achieves

veyed the settlement condition to the parties as the Council's "bottom line" on the issue. The condition also was announced to the parties by the Council's agent, the Assistant City Attorney, revealing that the condition was city policy. Moreover, the condition was evident from the schedule on which the Council considered the question. Golden State's franchise issue was deferred from February 11 to the 17th, from February 17 to March 23, and from March 23 to the 31st. Only Golden State, among the franchise applicants, was subjected to a conditional 1-month extension of its franchise. The only plausible reason for these repeated short extensions is that the city was giving the franchise holder additional time to comply with a particular requirement. Yet Golden State was in compliance with all the terms of the franchise except the Council's desire for a settlement.

national policy "by encouraging the practice and procedure of collective bargaining").

The legislative history, too, makes clear that the Act and the National Labor Relations Board were intended to facilitate bargaining between the parties. The Senate Report states: "Disputes about wages, hours of work, and other working conditions should continue to be resolved by the play of competitive forces . . . . This bill in no respect regulates or even provides for supervision of wages or hours, nor does it establish any form of compulsory arbitration." S. Rep. No. 573, 74th Cong., 1st Sess., 2 (1935). Senator Wagner, sponsor of the NLRA, said that the Board would not usurp the role of free collective action. See 79 Cong. Rec. 6184 (1935). See also *id.*, at 7574 (Sen. Wagner affirming that the Act encourages "voluntary settlement of industrial disputes").

Protecting the free use of economic weapons during the course of negotiations was the rationale for this Court's findings of pre-emption in *Machinists* and in its predecessor, *Teamsters* v. *Morton*, 377 U. S. 252 (1964). In some areas of labor relations that the NLRA left unregulated, we have concluded that Congress contemplated state regulation. See *Metropolitan Life Ins. Co.* v. *Massachusetts*, 471 U. S., at 754–758; *New York Tel. Co.* v. *New York Labor Dept.*, 440 U. S. 519, 540–544 (1979) (plurality opinion); *id.*, at 547 and 549 (opinions concurring in result and concurring in judgment). Los Angeles, however, has pointed to no evidence of such congressional intent with respect to the conduct at issue in this case.[7]

Instead, the city argues that it is somehow immune from labor pre-emption solely because of the nature of its con-

---

[7] There is no issue here that, rather than regulating the relationship between the employer and the union, the city's action protected innocent third parties from the employer. See *Belknap, Inc.* v. *Hale*, 463 U. S. 491, 500 (1983) (third parties hired as strike replacements based on misrepresentations by the employer had state-law causes of action).

duct.[8]  The city contends it was not regulating labor, but simply exercising a traditional municipal function in issuing taxicab franchises.  We recently rejected a similar argument to the effect that a State's spending decisions are not subject to pre-emption.  See *Wisconsin Dept. of Industry* v. *Gould Inc., ante,* at 287–288.  Cf. *Metropolitan Life Ins. Co.* v. *Massachusetts,* 471 U. S., at 754–758.  Similarly, in the transportation area, a State may not ensure uninterrupted service to the public by prohibiting a strike by the unionized employees of a privately owned local transit company.  See *Bus Employees* v. *Missouri,* 374 U. S. 74 (1963); cf. *Bus Employees* v. *Wisconsin Employment Relations Board,* 340 U. S. 383, 391–392 (1951).  Nor in this case may a city restrict a transportation employer's ability to resist a strike. Although in each *Bus Employees* case the employees' right to strike was protected by § 7, as amended, of the NLRA, 29 U. S. C. § 157, " '[r]esort to economic weapons should more peaceful measures not avail' is the right of the employer as well as the employee," and "the State may not prohibit the use of such weapons . . . any more than in the case of employees." *Machinists* v. *Wisconsin Employment Relations Comm'n,* 427 U. S., at 147, quoting *American Ship Building Co.* v. *NLRB,* 380 U. S., at 317.  "[F]ederal law intended to leave the employer and the union free to use their economic weapons against one another." *Belknap, Inc.* v. *Hale,* 463 U. S., at 500.  We hold, therefore, that the city was pre-empted from conditioning Golden State's franchise renewal on the settlement of the labor dispute.

---

[8] The Court of Appeals, in holding that the city's action was not preempted, reasoned that what the city did involved merely a peripheral concern of federal labor law.  The idea that state action may be upheld under such circumstances is part of the *Garmon* analysis.  See *Belknap, Inc.* v. *Hale,* 463 U. S., at 498–499.  Because we hold that the city directly interfered with the bargaining process—a central concern of the NLRA—we need not reach the question whether this exception applies to a *Machinists* case.  But see *Metropolitan Life Ins. Co.* v. *Massachusetts,* 471 U. S. 724, 754–758 (1985).

The city, however, contends that it was in a no-win situation: having not renewed the franchise and thus permitting it to lapse, it stands accused of favoring the union; had it granted the renewal, it would have been accused of favoring the employer. But the question is not whether the city's action favors one side or the other. Our holding does not require a city to renew or to refuse to renew any particular franchise. We hold only that a city cannot condition a franchise renewal in a way that intrudes into the collective-bargaining process.

## C

"Free collective bargaining is the cornerstone of the structure of labor-management relations carefully designed by Congress when it enacted the NLRA." *New York Tel. Co.* v. *New York Labor Dept.*, 440 U. S., at 551 (POWELL, J., dissenting). Even though agreement is sometimes impossible, government may not step in and become a party to the negotiations. See *H. K. Porter Co.* v. *NLRB*, 397 U. S., at 103–104. A local government, as well as the National Labor Relations Board, lacks the authority to "'introduce some standard of properly "balanced" bargaining power' . . . or to define 'what economic sanctions might be permitted negotiating parties in an "ideal" or "balanced" state of collective bargaining.'" *Machinists* v. *Wisconsin Employment Relations Comm'n*, 427 U. S., at 149–150, quoting *NLRB* v. *Insurance Agents*, 361 U. S. 477, 497–500 (1960). The settlement condition imposed by the Los Angeles City Council, as we read the summary-judgment record before us, destroyed the balance of power designed by Congress, and frustrated Congress' decision to leave open the use of economic weapons.

In this case, the District Court and the Court of Appeals found that the city had conditioned the renewal of Golden State's franchise on the company's reaching a labor agreement with the Teamsters, but held that the city's action was not pre-empted by *Machinists*. This was error as a matter of law. Whether summary judgment should have been en-

tered for Golden State is a matter we do not decide, for petitioner made no motion for summary judgment on the issue of pre-emption.

The Court of Appeals' judgment affirming the summary judgment entered for the city is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE REHNQUIST, dissenting.

The city of Los Angeles refused to renew Golden State's taxicab franchise unless it settled a labor dispute with its drivers. The Court of Appeals for the Ninth Circuit stated that "[n]othing in the record indicates that the City's refusal to renew or extend Golden State's franchise until an agreement was reached and operations resumed was not concerned with transportation." 754 F. 2d 830, 833 (1985). Nonetheless, the Court today holds that "a city cannot condition a franchise renewal in a way that intrudes into the collective-bargaining process." *Ante,* at 619. The extraordinary breadth of the Court's holding is best illustrated by comparing it to this Court's initial cases involving federal labor preemption.

In *Bethlehem Steel Co.* v. *New York State Labor Relations Board,* 330 U. S. 767 (1947), this Court addressed the permissible scope of state regulation of labor disputes by examining New York's so-called Little Wagner Act, under which foremen were permitted to unionize. The status of foremen under the federal Act had been a matter of dispute at the time that New York asserted its right to supervise the organization of a union of foremen at the Bethlehem Steel Company plant in that State. See *id.,* at 770. The State argued that its labor relations machinery could operate at least until similar benefits for foremen were sought by the union under the federal Act. See *id.,* at 771. This Court held that the federal law pre-empted the state law on this point; both dealt with exactly the same subject matter and

whether or not they were the same or different with respect
to the permissibility of organizing foremen made no differ-
ence. *Id.*, at 775. If they were the same, the procedures
were duplicative. *Id.*, at 776. If they were different, they
were potentially antagonistic. *Ibid.*

Six years later, in *Garner* v. *Teamsters*, 346 U. S. 485
(1953), the Court was presented with a claim of pre-emption
under the Taft-Hartley Act, which imposed regulations and
duties on labor correlative to the those imposed on manage-
ment by the Wagner Act. The case involved unionized driv-
ers who had engaged in conduct clearly prohibited by the
Taft-Hartley Act, which might have made them subject to
a cease-and-desist order by the National Labor Relations
Board. See *id.*, at 486–487. But instead of resorting to the
federal agency, the employer successfully sought an injunc-
tion against the prohibited picketing from a Pennsylvania
state court. See *id.*, at 487. This Court held that state
duplication of remedies provided by the National Labor Rela-
tions Act was pre-empted even though the state remedy was
provided by a court rather than a state labor agency. See
*id.*, at 487, 499–501.

The opinions in both *Bethlehem Steel* and *Garner* observed
that Congress had furnished no guidance to the Court as to
whether or not state regulation should be pre-empted:

> "Congress has not seen fit to lay down even the most
> general of guides to construction of the Act, as it some-
> times does, by saying that its regulation either shall or
> shall not exclude state action." *Bethlehem Steel, supra,*
> at 771.
>
> "The national Labor Management Relations Act, as
> we have before pointed out, leaves much to the states,
> though Congress has refrained from telling us how
> much." *Garner, supra,* at 488 (footnote omitted).

The Court stated in both that it was forced simply to divine
the will of Congress by implication:

"[The] exclusion of state action may be implied from the nature of the legislation and the subject matter although express declaration of such result is wanting." *Bethlehem Steel, supra,* at 772.

"We must spell out from conflicting indications of congressional will the area in which state action is still permissible." *Garner, supra,* at 488.

From the acorns of these two very sensible decisions has grown the mighty oak of this Court's labor pre-emption doctrine, which sweeps ever outward though still totally uninformed by any express directive from Congress. The National Labor Relations Board, organized management, and organized labor have vied with each other in urging the Court to sweep into the maw of labor relations law concerns that would have been regarded as totally peripheral to that body of law by the Congresses which enacted the Wagner Act and the Taft-Hartley Act.

Today we are told that a city, not seeking to place its weight on one side or the other of the scales of economic warfare, may not condition the renewal of a taxicab franchise on the settlement of a labor dispute. The settlement of that dispute would have enabled the company to put its taxis back on the streets where the franchise presumably contemplated they would be. The Court says that since the Labor Board may not structure an ideal balance of collective-bargaining weapons, the city may not consider the existence of a labor dispute in deciding whether to renew a franchise. See *ante,* at 619–620. We are further told that because a State may not legislate to provide uninterrupted service to the public by prohibiting a strike of public utility employees, a city may not act upon its views of sound transportation policy to refuse to renew a taxi franchise unless the franchisee settles a labor dispute and returns its cabs to the purpose for which the franchise exists. See *ante,* at 617–618. Such sweeping generalizations commend themselves neither to common sense nor to whatever hypothetical "intent of Congress" as can be

discerned in an area so remote from the core concerns of labor-management relations addressed by federal labor law.

Federal pre-emption of state law is a matter of congressional intent, presumed or expressed. Because Congress cannot foresee the various ways in which state laws might rub up against the operation of federal statutes, the Court in a multitude of cases has held state regulation pre-empted even when Congress has not expressed any intent to pre-empt because of the danger that the existence of federal and state regulations side by side will interfere with the achievement of the objectives of the federal legislation. The entire body of this Court's labor law pre-emption doctrine has been built on a series of implications as to congressional intent in the face of congressional silence, so that we now have an elaborate pre-emption doctrine traceable not to any expression of Congress, but only to statements by this Court in its previous opinions of what Congress must have intended.

The Court today doffs its hat to the legislative history of the Wagner Act and comes up with the following three items:

> "[1] The Senate Report states: 'Disputes about wages, hours of work, and other working conditions should continue to be resolved by the play of competitive forces . . . . This bill in no respect regulates or even provides for supervision of wages or hours, nor does it establish any form of compulsory arbitration.'
>
> "[2] Senator Wagner, sponsor of the NLRA, said that the Board would not usurp the role of free collective action.
>
> "[3] Senator Wagner affirm[ed] that the Act encourages 'voluntary settlement of industrial disputes.'"
>
> *Ante,* at 617 (citations omitted).

These three bits of legislative history furnish absolutely no support for the result the Court reaches today. The observations that the Wagner Act leaves it to the parties to resolve their disputes by the play of competitive forces, that the Labor Board would not usurp the role of free collective

action, and that the Act encourages voluntary settlement of industrial disputes, simply do not speak to the question whether a city may condition the renewal of a taxicab franchise on the settlement of a labor dispute. I do not believe that Congress intended the labor law net to be cast this far, and I therefore dissent.