AEROGROUND, INC., Plaintiff,

v.

CITY AND COUNTY OF SAN FRANCISCO, et al, Defendants.

No. C–01–1628 VRW.

United States District Court, N.D. California.

July 9, 2001.

Gregory S. Walden, Sally D. Garr, Patton Boggs LLP, Washington, DC, Natalie A. Beccia, Ursula A. Wynhoven, William Gaus, Pillsbury Winthrop LLP, San Francisco, CA, for plaintiff.

Mara E. Rosales, Airport General Counsel, San Francisco International Airport, San Francisco, CA, Matthew Ross, Philip C. Monrad, Leonard Carder Nathan Zuckerman ross, Oakland, CA, for defendants.

## ORDER

WALKER, District Judge.

Plaintiff Aeroground, Inc, a company that provides cargo-handling services for airlines at the San Francisco International Airport, challenges the airport commission's "Labor Peace/Card Check" rule. For the reasons set forth below, Aeroground's motion for a preliminary injunction (Doc # 11) is GRANTED.

## I

The City and County of San Francisco owns the airport, which is operated by the city's airport commission headed by the airport director, John L Martin (collectively, defendants). Beccia Decl (Doc # 14), Exh A at 1. On February 1, 2000, the airport commission adopted a rule called the "Labor Peace/Card Check" rule in an effort to minimize the perceived threat of labor unrest arising out of union organizing drives at the airport. Id, Exh B. While obligating unions not to undertake economic actions such as strikes, picketing and boycotts in relation to organizing campaigns, the rule requires certain employers operating at the airport to enter into a "Labor Peace/Card Check" agreement with any union that has registered with the airport director and requested such an agreement. Id § II(3)(c); id § II(1)(a).

Under the rule, the labor agreement must provide that the preference of the company's employees with respect to union representation be determined by a card check procedure. Id § I(1)(a); id § II(1)(a). A card check procedure is a process whereby a union provides employees with cards that ask them to designate the union as their bargaining representative; if a majority of the employees sign and return the cards to an objective third party, the union becomes the employees' exclusive bargaining representative. See *Hotel Employees, Local 2 v. Marriott Corp.*, 961 F.2d 1464, 1465 n. 1 (9th Cir. 1992). Absent an agreement recognizing the card check procedure, an employer has the right under the National Labor Relations Act (NLRA) to insist that the issue of union representation be determined by a secret ballot election conducted by the National Labor Relations Board (NLRB). *Id.* at 1468; 29 USC § 159(e). The card check rule, therefore, compels employers desiring to continue to do business at the

airport to forego their right to have the union status of their employees determined by NLRB elections.

Aside from mandating the card check procedure, the rule also includes several other provisions affecting the conduct of employers at the airport. The rule requires the labor agreement to compel the parties to submit to binding arbitration over disputes about the proper interpretation of the agreement or regarding issues arising out of the card check process. Beccia Decl (Doc # 14), Exh B § I(1)(b). The rule also obligates employers to include in any subcontract a provision requiring the subcontractor to abide by the terms of the rule. Id § II(1)(d). And in the event the employer and union fail to negotiate a labor agreement within 30 days of the union's request, the parties become bound by the "Model Card Check Agreement," which requires, among other things, that the employer provide the union with the names, addresses and phone numbers of its employees. Id § III; see also id, attachment § 1(I).

Aeroground is currently one of the employers subject to the card check rule. To be sure, the rule explicitly exempts an employer's operations at the airport that are regulated by the Railway Labor Act (RLA), 45 USC § 151 et seq, as determined by a final decision of a court or agency or by agreement between the employer and its employees' bargaining representative. Id § II(4)(d). Aeroground asserts that its operations at the airport are governed by the RLA, but that issue is not before the court. Indeed, the RLA status of Aeroground is currently being evaluated by the National Mediation Board. In any event, whether Aeroground is covered by the RLA is not yet resolved, and thus the provisions of the card check rule continue to govern its relationship with the airport.

On February 2, 2001, the Teamsters, Local 85 requested that Aeroground enter into a labor agreement with it pursuant to the card check rule. Aeroground petitioned the airport director for an exemption as an RLA-governed company. The airport director denied Aeroground's petition and the airport commission later confirmed that decision. Rather than agreeing to enter a labor agreement with the Teamsters, Aeroground initiated this litigation on April 25, 2001, seeking declaratory and injunctive relief from the rule. See Compl (Doc # 1). A refusal by Aeroground to enter such an agreement triggers the airport director's authority to terminate Aeroground's aviation support services permit. Beccia Decl (Doc # 14), Exh B § IV(2); see also id, Exh A § 11.14. Without this permit, Aeroground would be unable to conduct its business at the airport.

Aeroground asserts that the card check rule is preempted by the NLRA, the RLA and the Airline Deregulation Act (ADA). In addition, because the NLRA provides rights with which states and municipalities may not interfere, Aeroground similarly contends that the rule deprives Aeroground of its NLRA rights in violation of 42 USC § 1983. By the present motion, Aeroground seeks an order preliminarily enjoining defendants from enforcing the card check rule against it during the pendency of this action.

## II

█ As a preliminary matter, defendants argue that because Aeroground signed the permit with the city in October 2000, which explicitly requires compliance with the card check rule, Aeroground waived the ability now to argue that the rule is preempted by federal law. It is well established, however, that waiver is not effective unless it is a "voluntary or

intentional relinquishment of a known right." *Matsuo Yoshida v. Liberty Mut. Ins. Co.*, 240 F.2d 824, 829 (9th Cir.1957). The court's analysis of waiver should focus on the mental attitude of the actor. Id.

■ In this regard, Aeroground points out that it did not voluntarily sign the permit. See Bonino Decl (Doc # 82), ¶¶ 2–5. In fact, Aeroground protested to the airport that it did not want to sign the permit because of the requirement of compliance with the card check rule. Id, ¶ 5. Defendants, however, gave Aeroground no choice because without the permit Aeroground could not service its airline customers at the airport. Aeroground's decision to sign the permit thus appears not to have been voluntary. Accordingly, the court concludes that defendants' argument based on waiver lacks merit.

### III

■ To prevail on a motion for preliminary injunction, the moving party must satisfy one of two tests available in this circuit. Under the traditional test, the party must demonstrate: (1) irreparable injury if the relief is denied; (2) probability of success on the merits; (3) the balance of potential harm favors the moving party; and (4) the public interest favors the injunction. See *International Jensen, Inc. v. Metrosound USA Inc.*, 4 F.3d 819, 822 (9th Cir.1993). Under the alternative test, the moving party can prevail "by demonstrating either (1) a combination of probable success on the merits and the possibility of irreparable injury if the relief is not granted; or (2) the existence of serious questions going to the merits and that the balance of hardships tips sharply in its favor." *Id.* These two formulations under the alternative test "represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases."

*Prudential Real Estate Affiliates v. PPR Realty*, 204 F.3d 867, 874 (9th Cir.2000).

Aeroground contends that it must prevail because it is likely to succeed on the merits of its claims and a sufficient degree of irreparable injury will ensue without an injunction. As set forth below, the court concludes that Aeroground has satisfied its burden for a preliminary injunction.

### A

■ Aeroground contends that the card check rule is likely to be invalidated as preempted by federal law. Under the Supreme Court's interpretation of the Supremacy Clause of the Constitution, U.S. Const Art VI, cl 2, federal laws preempt state and local laws in at least three circumstances: (1) when the federal law contains an express preemption provision, (2) when the state or local law is in "actual conflict" with the federal law, or (3) when there is no clear conflict, but Congress intended the federal law to "occupy the field." See *Crosby v. National Foreign Trade Council*, 530 U.S. 363, 372–73, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000).

Aeroground's strongest preemption argument is based on the NLRA, 29 USC § 151 et seq. The NLRA does not contain an express preemption provision. *Building and Constr. Trades Council v. Associated Builders & Contractors of Mass/RI, Inc.*, 507 U.S. 218, 224, 113 S.Ct. 1190, 122 L.Ed.2d 565 (1993) (hereinafter, *Boston Harbor*). Nevertheless, "[i]t is by now a commonplace that in passing the NLRA Congress largely displaced state [and municipal] regulation of industrial relations." *Wisconsin Dept. of Industry v. Gould Inc.*, 475 U.S. 282, 286, 106 S.Ct. 1057, 89 L.Ed.2d 223 (1986). Indeed, the Supreme Court has articulated two distinct NLRA preemption principles. *Boston Harbor*, 507 U.S. at 224, 113 S.Ct. 1190.

The first, known as "*Garmon* preemption," was established by the Court in *San Diego Building Trades Council v. Garmon*, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959), and corresponds to the "actual conflict" category of general preemption theory. See Kevin J McKeon, *NLRA Preemption Put Simply: Livadas v Bradshaw*, 33 Duq L Rev 887, 893 (1995) (hereinafter, McKeon). *Garmon* preemption prohibits state and local regulation of activities that the NLRA "protects, prohibits, or arguably protects or prohibits." *Gould*, 475 U.S. at 286, 106 S.Ct. 1057. The second principle, "*Machinists* preemption," is analogous to the theory of field preemption, see McKeon at 894, and prohibits state and municipal regulation of areas that have been left "to be controlled by the free play of economic forces." *Machinists v. Wisconsin Employment Relations Comm'n*, 427 U.S. 132, 140, 96 S.Ct. 2548, 49 L.Ed.2d 396 (1976).

Aeroground argues that the card check rule is preempted under the *Garmon* doctrine. As noted, *Garmon* stands for the proposition that states and municipalities may not set forth standards of conduct that are inconsistent with the substantive requirements or protections of the NLRA. See *Gould*, 475 U.S. at 286, 106 S.Ct. 1057. "The *Garmon* rule is intended to preclude state interference with the National Labor Relations Board's interpretation and active enforcement of the 'integrated scheme of regulation' established by the NLRA." *Golden State Transit Corp. v. City of Los Angeles*, 475 U.S. 608, 613, 106 S.Ct. 1395, 89 L.Ed.2d 616 (1986). *Garmon* involved concerted activities and unfair labor practices, which are regulated by sections 7 and 8 of the NLRA, see *Garmon*, 359 U.S. at 241, 79 S.Ct. 773, but the doctrine has also been applied to conduct related to the activities regulated by section 9 of the act, such as the process for determining union representation. See, eg, *Penn Nurses*

*Ass'n v. Penn. State Educ. Ass'n*, 90 F.3d 797, 802–03 (3d Cir.1996); *NLRB v. Western Meat Packers, Inc.*, 350 F.2d 804, 806 (10th Cir.1965); *St. Francis Hosp. v. Connecticut Board of Labor Relations*, 1974 WL 1266, at *3 (D.Conn.1974). The court need not decide whether the conduct at issue would be deemed to be protected or prohibited by the NLRA, since "it is enough that the conduct upon which [Aeroground's] causes of action are based is 'arguably' [protected or] prohibited." *Penn Nurses*, 90 F.3d at 802.

Aeroground contends that the card check rule interferes with substantive rights and requirements established by the NLRA. Section 9, for example, provides a formal mode for employees to select and reject their bargaining representatives through secret ballot elections conducted by the NLRB. 29 USC § 159. As touched upon above, employers have the right under section 9 to insist on such an election when it appears that employee interest in union representation exists. See id. Defendants agree that employers have this right. See Def Opp Br (Doc # 73) at 13–14. As noted, however, the card check rule requires non-exempt employers operating at the airport to forego this right by agreeing as a condition of its permit that union representation be determined by a card check procedure.

As another example, the NLRA provides the NLRB with the authority to address unfair labor practices, including any disputes arising out of interference in an employee's exercise of his right to determine union representation, among other rights, guaranteed by section 7. See 29 USC § 160(a). "This power [of the NLRB] shall not be affected by any other means of adjustment or prevention that has been or may be established by agreement, law, or otherwise." Id. The card check rule, however, requires that non-

exempt employers at the airport agree to submit to binding arbitration for disputes that arise over the determination of union representation through the card check process.

These examples demonstrate that the card check rule appears to "set[ ] forth standards inconsistent with the substantive requirements of the NLRA" by requiring conduct that conflicts with certain options for employers that are protected by the NLRA. See *Gould,* 475 U.S. at 286, 106 S.Ct. 1057. By pointing out these conflicts, the court concludes that Aeroground has demonstrated that a significant probability exists that the rule is preempted under the *Garmon* doctrine.

Defendants essentially concede this point. Indeed, defendants do not address the *Garmon* doctrine in opposing Aeroground's motion. Instead, defendants' entire argument with respect to the likelihood that Aeroground's claims will succeed on the merits is based on the "market participant" doctrine established by the Supreme Court in *Boston Harbor,* 507 U.S. 218, 113 S.Ct. 1190, 122 L.Ed.2d 565. The court turns to that argument now.

## B

In *Boston Harbor,* the Supreme Court recognized that despite the existence of the two established NLRA preemption principles, states and municipalities do not regulate simply by acting within one of the areas protected by *Garmon* and *Machinists. Boston Harbor,* 507 U.S. at 227, 113 S.Ct. 1190. Many government contracting decisions do not constitute concealed attempts to regulate because "in order to function, government entities must have some dealings with the market." *Cardinal Towing v. City of Bedford, Texas,* 180 F.3d 686, 692 (5th Cir.1999). As a result, the Supreme Court has "held consistently that the NLRA was intended to supplant state labor *regulation,* not all legitimate activity that affects labor." *Boston Harbor,* 507 U.S. at 227, 113 .S.Ct. 1190 (emphasis in original). In *Boston Harbor,* the Court concluded that the NLRA preempts the two categories of state and local regulation discussed above, but does not preempt actions taken by a government entity when it acts as a mere proprietor or market participant. *Dillingham Const. NA, Inc. v. County of Sonoma,* 190 F.3d 1034, 1037 (9th Cir.1999) (citing *Boston Harbor*). Specifically, the Court provided as follows:

> In the absence of any express or implied indication by Congress that a State may not manage its own property when it pursues its purely proprietary interests, and where analogous private conduct would be permitted, this Court will not infer [preemption by the NLRA].

*Boston Harbor,* 507 U.S. at 231–32, 113 S.Ct. 1190.

■ In this regard, defendants assert that the card check rule is not preempted by the NLRA because the rule operates solely to protect the city's proprietary interests. See Def Opp Br (Doc # 73) at 8–9. Indeed, defendants spill much ink emphasizing the "capitalist" nature of the airport and how it allegedly operates "as a discrete business enterprise, fiscally and operationally separate from other City departments and operations, with its own unique revenue and capital needs." Id at 9–13. All of this is an attempt to demonstrate that the airport is the equivalent of a private business enterprise protecting its proprietary interests by minimizing labor unrest through the adoption of the card check rule. But defendants' assertion that the airport operates as a private business enterprise simply begs the question: is the card check rule a proprietary action immune from preemption or a regulatory action preempted by the NLRA?

The Fifth Circuit recently articulated a straightforward test for distinguishing between proprietary and regulatory actions by a government entity. *Cardinal Towing,* 180 F.3d at 693. To make this determination, the court must ask two questions:

First, does the challenged action essentially reflect the entity's own interest in its efficient procurement of needed goods and services, as measured by comparison with the typical behavior of private parties in similar circumstances? Second, does the narrow scope of the challenged action defeat an inference that its primary goal was to encourage a general policy rather than address a specific proprietary problem?

Id. As the Fifth Circuit observed, these questions are intended "to isolate a class of government interactions with the market that are so narrowly focused, and so in keeping with the ordinary behavior of private parties, that a regulatory impulse can be safely ruled out." Id. The answer to both questions in the present matter is negative.

First, defendants do not assert that the card check rule is a mechanism for the airport efficiently to procure goods and services for the airport. Instead, the card check rule applies to all non-exempt employers at the airport and requires them to enter a labor agreement with a requesting union under the threat of being cut off from doing business at the airport. In contrast to many of the cases cited by defendants in which the market participant doctrine was employed to shield governmental action from NLRA preemption, the card check rule is not an effort by the airport to contract directly with Aeroground, or other employers, for goods or services. See *Boston Harbor,* 507 U.S. at 221–22, 113 S.Ct. 1190 (city agency imposed labor requirements on successful

bidder as a condition for being hired by the agency to complete a harbor cleanup project); *Cardinal Towing,* 180 F.3d at 689 (city imposed specific requirements on towing company hired by the city to perform non-consensual tows for the police; the requirements did not apply to non-consensual tows requested by private property owners); *Associated Gen. Contr. v. Metro. Water District,* 159 F.3d 1178, 1180 (9th Cir.1998) (metropolitan water district imposed labor agreements on contractors and subcontractors hired to construct two water projects); *Associated Builders v. City of Seward,* 966 F.2d 492, 493–95 (9th Cir.1992) (city required contractor hired by the city to enter labor agreement for purposes of a project to replace an electric transmission line). Indeed, the Supreme Court made clear in *Boston Harbor* that its decision rested in part on the fact that the agency's action was an attempt "to ensure an efficient project that would be completed as quickly and effectively as possible at the lowest cost *** [and that] the challenged action *** was specifically tailored to one particular job." *Boston Harbor,* 507 U.S. at 232, 113 S.Ct. 1190. Such is not the case here.

As Aeroground correctly points out, the card check rule operates essentially as a licensing scheme that controls the conditions under which Aeroground and other employers can contract with private third parties—in Aeroground's case, the airlines. The card check rule is thus remarkably similar to the city action at issue in *Golden State Transit Corp. v. City of Los Angeles,* 475 U.S. 608, 106 S.Ct. 1395, 89 L.Ed.2d 616 (1986). In that case, Los Angeles conditioned the renewal of a taxicab franchise upon the settlement of a labor dispute. Id at 609–11, 106 S.Ct. 1395. The Supreme Court concluded that such a condition was preempted by the *Machinists* doctrine. *Id.* at 614, 106 S.Ct. 1395. In *Boston Harbor,* the Court recognized that

"a very different case would have been presented had the city of Los Angeles purchased taxi services from Golden State in order to transport city employees." *Boston Harbor*, 507 U.S. at 227, 113 S.Ct. 1190. Similarly, a different situation would exist here if defendants purchased Aeroground's cargo-handling services. But defendants do not assert that they contracted directly with Aeroground in this regard; rather, defendants have attempted to influence the behavior of certain employers at the airport ostensibly to minimize labor unrest. Accordingly, the card check rule cannot be characterized as an effort by the airport to procure goods and services for some discrete city project.

This analysis also indicates that the answer to the second question under *Cardinal Towing* is self-evident. Clearly, the card check rule is not narrow in scope. As noted, it applies to all non-exempt employers at the airport and has the effect of controlling the conduct of these employers in their dealings with third parties. Such an effort is a classic example of regulation, suggesting that defendants intended the rule to encourage a general policy regarding employer-employee labor relations at the airport.

Defendants attempt to rebut this inference by pointing to the airport commission's resolutions upon which the card check rule was based. See Beccia Decl (Doc # 14), Exh B. In pertinent part, the airport commission stated:

> [T]he sole purpose of this Rule is to protect the Airport Commission and its proprietary interest in the efficient operation of the Airport and the resulting revenues from those operations ***. The Rule is not intended to enact or express any generally applicable policy regarding labor/management relations, or to regulate those relations in any way.

Id. The words of the resolutions, however, cannot defeat the actuality of the card check rule's application. The airport commission may have intended the rule solely as a device for increasing the airport's revenues, but simply addressing the financial interests of a public entity does not make such efforts those of a market participant. If that were the case, then every effort by a government entity to increase its revenues could be characterized as market participation. The exception to NLRA preemption established by *Boston Harbor* is much narrower.

The Ninth Circuit's decision in *Dillingham Const. NA, Inc. v. County of Sonoma*, 190 F.3d 1034 (9th Cir.1999), is instructive in this regard. In that case, a contractor challenged a labor law enacted by California that required state public works contractors to pay their employees "prevailing wages," but allowed the contractors to pay their apprentices an amount lower than the prevailing journeyman wage so long as the apprentices were part of a state-approved apprenticeship program. See id at 1036. To be sure, unlike San Francisco in the case at bar, the state was not operating a business enterprise in *Dillingham*. Defendants seized upon this distinction at the hearing on this motion in an attempt to distinguish the case. But this is a distinction without a difference because the issue is not whether the government entity operates a business, but whether the law at issue enables the city or state entity to procure goods or services in order to operate as a business. See *id.* at 1038.

The Ninth Circuit's reasoning in *Dillingham*, therefore, applies in the case at bar. Specifically, the appellate court concluded that the market participant doctrine did not protect the prevailing wage law from NLRA preemption, at least in part, because the law "applie[d] uniformly to all public works contracts executed in

the State of California." *Id.* As the court noted, "[t]he State did not merely create apprenticeship standards in its contract with Dillingham nor were the apprenticeship standards in [the] case created based upon unique needs that the [plaintiff's] project presented." *Id.* Similarly, the card check rule applies uniformly to all non-exempt employers at the airport and is not part of a particular project for which defendants hired Aeroground.

In sum, the court is not persuaded that the market participant doctrine applies in the case at bar. As a result, the court concludes that a probability of success exists that the card check rule will be found to be preempted by the NLRA. In light of this conclusion, the court need not address the merits of Aeroground's similar arguments under the RLA and the ADA. Given the strength of Aeroground's preemption claims, Aeroground is entitled to a preliminary injunction if a possibility of irreparable injury exists.

### C

Aeroground argues that the card check rule has inflicted, and is continuing to inflict, injury on its business. Specifically, Aeroground asserts that since it must have a permit from the city to provide its services at the airport, the mere threat by the airport director to terminate the permit has eroded the goodwill that Aeroground has established with its customers. Moreover, Aeroground contends that defendants' "lax enforcement" of the airport's security rules have enabled unions to harm Aeroground's reputation and business prospects. Indeed, Aeroground points out that several of its current and potential customers have expressed concern about Aeroground in reaction to flyers allegedly disbursed by unions that state Aeroground is failing to follow the card check rule.

Defendants contend that Aeroground cannot demonstrate any threat of irreparable injury because the airport commission has made a commitment not to enforce the card check rule against Aeroground until the NMB issues its ruling on Aeroground's RLA status. See Ross Decl (Doc # 24), Exh A (Letter from John L Martin to Aeroground). But this argument fails to take into account the harm to Aeroground's goodwill caused by the perception that Aeroground is refusing to comply with a rule that it believes is preempted by federal law. An intangible injury to a company's goodwill qualifies as irreparable harm. *Rent–A–Center v. Canyon Television & Appliance,* 944 F.2d 597, 603 (9th Cir1991).

### D

Finding a combination of probable success on the merits and the possibility of irreparable injury if the equitable relief is not granted, the court concludes that a preliminary injunction in this matter is warranted. Accordingly, Aeroground's motion for a preliminary injunction is GRANTED. The court hereby orders that defendants are enjoined from enforcing the "Labor Peace/Card Check" rule adopted by the airport commission on February 2, 2000, against Aeroground or otherwise to compel Aeroground to enter into a card check agreement with any union pending the outcome of this litigation.

IT IS SO ORDERED.