**THE ST. THOMAS-ST. JOHN HOTEL & TOURISM ASSOCIATION, INC.,
THE ST. THOMAS-ST. JOHN CHAMBER OF COMMERCE, INC.,
AND THE ST. CROIX HOTEL & TOURISM ASSOCIATION, INC., Plaintiffs
v.
THE GOVERNMENT OF THE UNITED STATES VIRGIN ISLANDS BY AND THROUGH THE VIRGIN ISLANDS DEPARTMENT OF LABOR AND ELEUTERIA ROBERTS, IN HER OFFICIAL CAPACITY AS ACTING COMMISSIONER OF THE VIRGIN ISLANDS DEPARTMENT OF LABOR, Defendants
ESLA HUGGINS AND LADIAH WHYTE, Intervenors**

D.C. Civil No. 1999-54

District Court of the Virgin Islands

Division of St. Thomas and St. John

June 2, 1999

317

CHARLES E. ENGEMAN, St. Thomas, *Attorney for plaintiffs.*

CAROL S. MOORE, MICHAEL MCLAURIN, Assistant Attorneys General, *For the defendant Government of the Virgin Islands.*

KATHLEEN NAVIN, Legal Services of the Virgin Islands, *For the Intervenors.*

MOORE, *Chief Judge.*

## MEMORANDUM

## INTRODUCTION

### Procedural Posture

Plaintiffs have sued to enjoin the Government of the Virgin Islands ["government"] from conducting any preliminary or formal hearings on wrongful discharge claims premised on the Virgin Islands Wrongful Discharge Act ["WDA"], V.I. CODE ANN. tit. 24, § 76, based on this Court's earlier ruling that federal labor law preempts the WDA. *See Bell v. Chase Manhattan Bank*, Civil No. 1997-129, ___ F. Supp. 2d ___, 1999 WL 86821 (D.V.I. Feb. 2, 1999). The plaintiffs' request for a temporary restraining order ["TRO"] against the Virgin Islands Department of Labor ["VIDOL"] was granted on April 6, 1999. A hearing on plaintiff's motion for preliminary injunction was scheduled for April 12, 1999. The government was granted continuances to allow it time to research and thoroughly brief the matter. Esla Huggins and Ladiah Whyte ["intervenors"] have been given permission to intervene as defendants.

On May 7, this Court heard argument and took evidence on the motion for preliminary injunction. At the end of the hearing, the Court extended the TRO for two weeks to give the parties time to file supplemental memoranda and to give itself time to prepare this Memorandum and Order. The extended TRO enjoined VIDOL

from conducting any formal wrongful discharge hearings, with the clarification that VIDOL could continue to accept wrongful discharge complaints and to facilitate mediation of the claims short of formal adjudication. The modified TRO has been further extended to May 2nd.

## The Parties

"Plaintiffs are not-for-profit corporations that represent the interests of the vast majority of employers on the islands of St. Thomas, St. John and St. Croix in the U.S. Virgin Islands." (Compl. at 1-2.) John Murphy, as a member of its board of directors, gave testimony on behalf of the St. Thomas-St. John Hotel & Tourism Association, whose members employ approximately 4,000 employees. John DeYoung, president of the Chamber of Commerce, testified that the Chamber has 640 members which employ over 7,000 employees. Wendell Snyder, treasurer of the St. Croix Hotel & Tourism Association, explained that its 235 members employ over 1,000 employees. All three boards authorized the suit to be filed on behalf of their respective organizations.

Eleuteria Roberts is the acting commissioner of VIDOL, the department charged with enforcement of the WDA.

The intervenors are St. Thomas residents who presently have wrongful discharge claims pending before VIDOL. Ms. Whyte was hired in August of 1998 and discharged in December of 1998. Ms. Huggins was hired in November of 1997 and discharged in July of 1998 [defendants and intervenors collectively are "respondents"]. Both intervenors seek backpay and reinstatement. (*See* Mot. to Intervene, Ex.s 1, 1A.)

## The Wrongful Discharge Act

In 1986, the Virgin Islands Legislature enacted the WDA,[1] which strictly limited to nine the legal grounds for which a private employer may dismiss an employee. The WDA declares that an employee of a private, non-governmental employer who is dismissed for any reason other than the nine enumerated grounds

---

[1] For a discussion of the legislative history of the WDA *see Bell*, slip op. at 6-11, 1989 WL 86821 ["WL"] *2.

319

"shall be considered to have been wrongfully discharged."[2] As originally enacted in 1986, the nine statutory grounds for discharge were prefaced by the phrase, "[u]nless modified by contract, an employer may dismiss an employee . . . ." 24 V.I.C. § 76(a) (Michie 1986). In 1996, however, the Legislature amended section 76(a) to provide that "[u]nless modified by union contract, an employer may dismiss any employee" only for the same nine reasons, plus, of course, business necessity or economic hardship. Thus, private non-union employment contracts may not provide any grounds for dismissal other than those contained in the WDA. The amended WDA requires a private employee to join a union and mandates that the private employer negotiate with that union

---

[2] The WDA provides:

Grounds for discharge

(a) Unless modified by union contract, an employer may dismiss any employee:
(1) who engages in a business which conflicts with his duties to his employer or renders him a rival of his employer;
(2) whose insolent or offensive conduct toward a customer of the employer injures the employer's business;
(3) whose use of intoxicants or controlled substances interferes with the proper discharge of his duties;
(4) who wilfully and intentionally disobeys reasonable and lawful rules, orders, and instructions of the employer; provided, however, the employer shall not bar an employee from patronizing the employer's business after the employee's working hours are completed;
(5) who performs his work assignments in a negligent manner;
(6) whose continuous absences from his place of employment affect the interests of his employer;
(7) who is incompetent or inefficient, thereby impairing his usefulness to his employer;
(8) who is dishonest; or
(9) whose conduct is such that it leads to the refusal, reluctance or inability of other employees to work with him.
(b) The Commissioner may by rule or regulation adopt additional grounds for discharge of an employee not inconsistent with the provisions enumerated in subsection (a) of this section.
(c) Any employee discharged for reasons other than those stated in subsection (a) of this section shall be considered to have been wrongfully discharged; however, nothing in this section shall be construed as prohibiting an employer from terminating an employee as a result of the cessation of business operations or as a result of a general cutback in the work force due to economic hardship, or as a result of the employee's participation in concerted activity that is not protected by this title.

24 V.I.C. § 76 (as amended). Note that the pre-amendment version differed only to the extent that the word union was not in the first clause.

320

before they can contract to modify, add to, or subtract from the statutory grounds for lawful discharge.

## The Temporary Restraining Order

This Court issued the TRO premised on the reasoning applied in *Bell v. Chase Manhattan Bank.* In *Bell,* the Court dismissed plaintiff's wrongful discharge count premised on the WDA, finding the act to be preempted on two bases.

First, the act is directly preempted by section 7 of the National Labor Relations Act, 29 U.S.C. §§ 151-69 ["NLRA"], which guarantees the "right to refrain" from all concerted activity because it requires union involvement before any contractual modification to the WDA's requirements. *See* 29 U.S.C. § 157; *Bell,* slip op. at 15-18, WL *4-5.

Second, the act is preempted because it upsets the "balance of power" between labor and management in an area Congress intended to remain free from state, territorial, or federal law under the reasoning of *Lodge 76, Machinists v. Wisconsin Employment Relations Comm'n,* 427 U.S. 132, 49 L. Ed. 2d 396, 96 S. Ct. 2548 (1976). *See Bell,* slip op. at 18-24, WL *5-8. The Legislature impermissibly intruded upon an area intended by Congress to be free from state or territorial legislation. *See Machinists,* 427 U.S. at 149.

## The Complaint

The complaint contains two counts. Count I alleges preemption of the WDA by federal labor law. Count II alleges a violation of 42 U.S.C. § 1983, namely, that the acting commissioner, acting in her official capacity under color of territorial law, has violated federal constitutional and statutory rights by enforcing the WDA. The complaint seeks a declaration that the act is unconstitutional and an injunction against its enforcement.[3]

Plaintiffs' argument is two-fold.[4] Plaintiffs allege that the WDA impermissibly tilts the field in favor of unionization by limiting

---

[3] Before the presentation of evidence by the plaintiffs, the government made an oral motion to dismiss. The Court allowed the government's counsel to argue that motion, then denied it from the bench.

[4] Plaintiffs additionally contend that the WDA is preempted insomuch as it applies to supervisors. The Court will not deal with this argument at this time.

any contractual modification to union contracts, per the 1996 amendment to the WDA. The assertion is that this violates federal labor policy as embodied in the NLRA and its encouragement and protection of voluntary unionism at the heart of the relationship between private employees and employers. *See Pattern Makers' League v. NLRB*, 473 U.S. 95, 99-103, 87 L. Ed. 2d 68, 105 S. Ct. 3064 (1985) (recognizing right of employees to refrain from concerted union activities by being able to resign union membership without interference.) Plaintiffs also allege that the WDA impairs the ability of an employer to defend itself against unionization efforts by preventing the employer from negotiating contracts with individual employees that contain changes in the terms of discharge.

## ANALYSIS

### Plaintiffs' Standing to Sue

[A]n association has standing to sue on behalf of its members "when (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."

*New York State Club Ass'n, Inc. v. City of New York*, 487 U.S. 1, 7, 101 L. Ed. 2d 1, 108 S. Ct. 2225 (1988) (quoting *Hunt v. Washington Apple Adver. Comm'n*, 432 U.S. 333, 343, 53 L. Ed. 2d 383, 97 S. Ct. 2434 (1977)). The individual employers which comprise the four plaintiff organizations would have standing to bring this suit in their own right since they are suffering immediate injury to their rights under national labor law.[5] The purpose of the first prong is "simply to weed out plaintiffs who try to bring cases, which could not

---

[5] This is especially true of those members that have pending cases before VIDOL. For example, the board member from the St. Thomas-St. John Hotel & Tourism Association testified that twelve of the employers scheduled for hearings in April were members of his association. "The association must allege that its members, **or any one of them,** are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justifiable case had the members themselves brought suit." *Warth v. Seldin*, 422 U.S. 490, 510, 45 L. Ed. 2d 343, 95 S. Ct. 2197 (1975) (emphasis added). However, the pendency of a claim is not the *sine qua non* of standing in this case, because, under the reasoning to be discussed below, plaintiffs allege that their interests

otherwise be brought, by manufacturing allegations of standing that lack any real foundation." *Id.* It is also true that neither the claim asserted (rights of employers to defend against unionization infringed, leading to NLRA preemption and resultant section 1983 violation)[6] nor the relief requested (declaratory and injunctive relief)[7] requires individual members of the plaintiff associations to participate in this suit. The only matter left, then, is whether this suit is germane to the plaintiff organizations' purposes.

■ The St. Thomas-St. John Hotel & Tourism Association's articles of incorporation state that the "objects, purposes and nonprofit activities of the corporation shall be . . . [t]o facilitate, protect and promote the mutual interests of the Corporation's members." (Pls.' Ex. A.) The St. Thomas-St. John Chamber of Commerce's articles of incorporation provide that the "objective of this Chamber shall be to . . . . Foster good relations between employers and employees; . . . . Advance the interests of member business[es] in the Virgin Islands in every way consistent with the public good; Represent its members with respect to issues of significance to business." (Pls.' Ex. B.) The St. Croix Hotel & Tourism Association's articles of incorporation provide that one of its "objects and purposes" is to "protect and promote the mutual interests of its members." (Pls.' Ex. C.) Even without the specifics of the plaintiffs' articles of incorporation, it is axiomatic that labor relations are germane to the purposes of all three plaintiff organi-

---

are infringed from a much earlier point than when a complaint is filed, *i.e.*, they are precluded from legitimately affecting the decision of employees to even consider a unionization drive.

[6] That is, there must be a "case or controversy" and "the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Id.* at 499-500.

[7] [W]hether an association has standing to invoke the court's remedial powers on behalf of its members depends in substantial measure on the nature of the relief sought. If in a proper case the association seeks a declaration, injunction, or some other form of prospective relief, it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured. Indeed, in all cases in which we have expressly recognized standing in associations to represent their members, the relief sought has been of this kind.

*Id.* at 515. Here, the plaintiffs are seeking declaratory and injunctive relief.

*zations. Since the plaintiffs meet all three prongs of New York State Club Ass'n,* the Court finds that all three associations have standing to bring this suit.

## The Four Factors for a Preliminary Injunction

"A district court can enter a preliminary injunction prohibiting state enforcement activities pending final resolution of a case in federal court alleging that state or local statutes are unconstitutional." *Rum Creek Coal Sales, Inc. v. Caperton,* 926 F.2d 353, 359 (4th Cir. 1991) (citing *Doran v. Salem Inn, Inc.,* 422 U.S. 922, 931-34, 45 L. Ed. 2d 648, 95 S. Ct. 2561 (1975)). Preliminary injunctions are granted at the discretion of the court. *See Joseph v. Henry,* 36 V.I. 115, 121-22, 958 F. Supp. 238, 243 (D.V.I. App. Div. 1997).

> There are four requirements for injunctive relief which must be satisfied before injunctive relief can be ordered:
> (1) the party moving for injunctive relief will suffer irreparable harm if injunctive relief is not forthcoming;
> (2) there is a probability of ultimate success on the merits;
> (3) the harm likely to be inflicted upon the moving party outweighs any harm that is likely to be suffered by the non-moving party if said injunctive relief is not awarded; and
> (4) the grant of the requested relief will not negatively impact upon the public interest.

*Id.*

### 1. Probability of Success on the Merits

"To establish a claim under Section 1983, plaintiff must show [1] that defendants are persons who acted under color of state law to [2] deprive him of a right, privilege, or immunity secured by the Constitution or laws of the United States." *Ballentine v. Virgin Islands Port Auth.,* 35 V.I. 472, 475, 955 F. Supp. 480, 482 (D.V.I. 1997) (citing 42 U.S.C. § 1983). As for the first prong, the acting commissioner is, of course, acting under color of territorial law, namely, the

324

WDA.[8] The second prong necessarily turns on how this Court rules on Count I, the preemption of the WDA by national labor law.

As discussed above, this Court previously found the WDA to be preempted in *Bell v. Chase Manhattan Bank*, dismissing the plaintiff's wrongful discharge count premised on the WDA, finding the act to be preempted on two bases. First, the act is directly preempted by section 7 of the NLRA, which guarantees the "right to refrain" from all concerted activity. 29 U.S.C. § 157. Second, the act is preempted because it upsets the "balance of power" between labor and management in an area Congress intended to remain free from state, territorial, or federal law under the reasoning of *Lodge 76, Machinists v. Wisconsin Employment Relations Comm'n*, 427 U.S. 132, 49 L. Ed. 2d 396, 96 S. Ct. 2548 (1976). Rather than reiterate its analysis in Bell, the Court will adopt its reasoning and conclusion and will elaborate on some of the specific issues raised in the case at bar.

A. Standing of Employers Under the NLRA

Aside from the general issue of plaintiffs' standing to sue, respondents have argued that employers "have no rights under the NLRA." This simply is not the case, as the Supreme Court has held in *Golden State Transit Corp. v. City of Los Angeles*, 475 U.S. 608, 89 L. Ed. 2d 616, 106 S. Ct. 1395 (1986) [*"Golden State I"*], and 493 U.S. 103, 110 S. Ct. 444, 107 L. Ed. 2d 420 (1989) [*"Golden State II"*]. In *Golden State I*, the Supreme Court held that the city violated federal law requiring the settlement of a pending labor dispute before it would renew Golden State's taxicab franchise. "'The State may not prohibit the use of [economic] weapons [of employers] . . . any more than in the case of employees.'" *Golden State I*, 475 U.S. at 618 (quoting *Machinists*, 427 U.S. at 147). In *Golden State II*, the Supreme Court agreed with the employer/taxi-cab company

---

[8] The acting commissioner is also a "person." "Of course a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because 'official-capacity actions for prospective relief are not treated as actions against the State.'" *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71 n.10, 105 L. Ed. 2d 45, 109 S. Ct. 2304 (1989) (quoting *Kentucky v. Graham*, 473 U.S. 159, 167 n.14, 87 L. Ed. 2d 114, 105 S. Ct. 3099 (1985)).

that it is the intended beneficiary of a statutory scheme that prevents governmental interference with the collective-bargaining process and that the NLRA gives it rights enforceable against governmental interference in an action under § 1983.

. . . [W]hen congressional pre-emption benefits particular parties only as an incident of the federal scheme of regulation, a private damages remedy under § 1983 may not be available. **The NLRA, however, creates rights in labor and management both against one another and against the State.** . . . We have thus stated that "[i]f the state law regulates conduct that is actually protected by federal law, . . . pre-emption follows . . . as a matter of substantive right." The rights protected against state interference, moreover, are not limited to those explicitly set forth in § 7 as protected against private interference. "The NLRA . . . has long been understood to protect a range of conduct against state but not private interference." And, contrary to the city's contention, "'resort to economic weapons should more peaceful measures not avail' is **the right of the employer as well as the employee."** *Machinists v. Wisconsin Employment Relations Comm'n,* 427 U.S. 132, 147, 49 L. Ed. 2d 396, 96 S. Ct. 2548 (1976) (quoting *American Ship Building Co. v. NLRB,* 380 U.S. 300, 317, 13 L. Ed. 2d 855, 85 S. Ct. 955, (1965)).

*Id.* 493 U.S. at 109-10 (emphasis added) (footnotes and other citations omitted). Further, as pointed out in *Golden State II,* "section 1(b) of [the Labor Management Relations Act, 29 U.S.C. §§ 141-97], states in pertinent part: 'It is the purpose and policy of this chapter . . . to prescribe the legitimate rights of both employees and employers in their relations affecting commerce . . . .'" *Id.* at 110 n.6.

Federal labor statutes in general, and section 7 in particular, guarantee rights to employers as well as to employees. The holding of a decision urged upon the Court by respondents for different reasons supports this conclusion. The United States Court of Appeals for the Ninth Circuit has held that the employer-plaintiff's "asserted injury, the competitive disadvantage it suffers relative to

unionized mines and the pressure to unionize, is injury in fact." *Viceroy Gold Corp. v. Aubry*, 75 F.3d 482, 488 (9th Cir. 1995). The pressure to unionize stemming from the WDA, which impermissibly tilts the playing field in violation of federal labor law, is exactly what the plaintiffs complain of here. Further, the WDA gives unionized employers a competitive advantage over non-unionized employers in the context of hiring and firing decisions. For instance, unionized employers are able to hire probationary employees and to enter into fixed-term contracts, giving them more flexibility than their non-union competitors in meeting changes in their demand for labor.[9]

## B. The WDA Was Intended to Affect Concerted Action, Treats Union and Non-union Parties differently, and Is Not a Minimum Employment Standard

Respondents argue that the WDA merely sets minimum employment standards and is therefore not preempted by federal labor law.[10] Although this Court has already found that the WDA exceeds the Territory's authority to establish minimum labor standards, the respondents nevertheless strenuously argue that the WDA merely sets minimum labor standards for Virgin Islands workers. This Court found that the WDA is not "within the ambit of acceptable local legislation relating to '[c]hild labor laws, minimum and other wage laws, laws affecting occupational health and safety' or state laws relating to workers compensation, state holidays, or payment while serving on juries." *Bell*, slip op. at 25, WL *7. One of the cases relied on to reach this conclusion was *Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 754-55, 85 L.

---

[9] A 1990 decision of this Court found the WDA survived challenges based on facial due process, the Contracts Clause, and the Takings Clause. *See General Offshore Corp. v. Farrelly*, 25 V.I. 226, 743 F. Supp. 1177 (D.V.I. 1990); *see also Bell*, at slip op. 11-12, WL *3. The Court in that opinion observed that the act "covers almost every conceivable reason for which an employer might reasonably wish to discharge an employee." 25 V.I. at 258, 743 F. Supp. at 1198. This *obiter dicta*, however, failed to note that the WDA prevents a non-union employer and employee from entering into a contract with a fixed term of employment or with a limited probationary period during which the employee can be discharged without cause.

[10] For example, the Legislature of the Virgin Islands has adopted numerous minimal employment standards relating to such issues as overtime pay (24 V.I.C. § 20), workers compensation insurance (24 V.I.C. §§ 250-92), and unemployment insurance (24 V.I.C. §§ 301-19).

327

Ed. 2d 728, 105 S. Ct. 2380 (1985) (finding no preemption of state law which required that employer-provided health insurance include mental-health benefits).

In *Metropolitan Life*, the Supreme Court considered a Massachusetts statute that required the group health insurance policies of all employers, union and non-union alike, to include mental health benefits. The Court held that the statute was not preempted by the NLRA because it set a "minimum employment standard." *Id.* at 755. The Court noted in passing that statutes regulating the terms of insurance contract were "commonplace in all 50 states" *Id.* at 728.[11] The Court found it important that such "minimum state labor standards affect union and nonunion employees equally, and neither encourage nor discourage the collective-bargaining processes that are the subject of the NLRA. Nor [may] they have any but the most indirect effect on the right of self-organization established" by the NLRA. *Id.* at 755. The salient characteristic of laws setting true minimum labor standards, such as the mandated insurance benefit law of Massachusetts, is that they are

> not laws designed to encourage or discourage employees in the promotion of their interests collectively; rather, they are . . . "designed to give specific minimum protections to individual workers and to ensure that each employee covered by the [minimum labor standard law] would receive" the mandated . . . coverage. Nor do these laws even inadvertently affect these interests implicated in the NLRA. Rather, they are minimum standards "independent of the collective bargaining process [that] devolve on [employees] as individual workers, not as members of a collective organization."

*Id.* at 755 (citations omitted). In short, a state law conflicts with none of the purposes of the national labor policy when it "establishes a minimal employment standard not inconsistent with the NLRA's general goals." *Id.* at 757.

Two years later, the Supreme Court considered NLRA preemption *vel non* of Maine's plant closing law in *Fort Halifax Packing Co.*

---

[11] As this Court found in *Bell*, nothing like the discharge provisions of the WDA has been passed by any other state or territory. Bell, slip op. at 9, WL *2.

*v. Coyne*, 482 U.S. 1, 96 L. Ed. 2d 1, 107 S. Ct. 2211 (1987). The Maine act, which is similar to the Virgin Islands Plant Closing Act,[12] generally required the employer to pay the employee who lost his job due to plant relocation one week's pay for each year of employment, unless "the employee is covered by an express contract providing for severance pay." *Fort Halifax*, 482 U.S. at 4 n.1. No differentiation was made between unionized and non-unionized employees. The Supreme Court held that the Maine act was not preempted, holding that it is a "minimum labor standard that does not intrude upon the collective bargaining process." *Id.* at 7. The Court found it significant that all parties, union and non-union alike, could contract for a severance pay term different from that automatically imposed by the statute. "The fact that the parties are free to devise their own severance arrangements . . . strengthens the case that the statute works no intrusion on collective bargaining. . . ." *Id.* at 22.

Whether a local law affecting the private employment relationship is preempted depends more on its effect on the participants to that relationship than whether it is labeled as establishing a "minimum employment standard." If such a law treats all parties equally, union and non-union alike, and is intended neither to encourage nor discourage protected concerted action, but is designed to apply to workers as individuals and not as members of a union, it will not be preempted. The WDA neither has such a benign effect on the private employment relationship nor sets "minimum employment standards." Not only does the WDA treat unionized and non-unionized parties unequally, it also was enacted with the specific intention of encouraging concerted action.

On February 21, 1996, the Legislature amended the WDA to clarify that only a unionized employer and its unionized employees may modify the statutory grounds on which an employer may discharge an employee. *See* 24 V.I.C. § 76(a) (Michie 1997). The floor debate on the amendment consists of one statement by the sponsoring legislator:

> Mr. President, I do not need three minutes to explain this, because we have had a number of hearings on this

---

[12] *See* 24 V.I.C. §§ 471-78.

particular issue. We have seen the practices in the private sector, where our workers have been exploited because of the unclear language in the present statute where there is room for the managers in the private sector to force our workers to sign these what are called, "the yellow dog contracts"; thereby, in many instances **forcing employees to give up most of their rights where collective bargaining is concern [sic]. And this amendment simply attempt [sic] to clarify the code and say exactly what we mean, that any modification must come, it must be in a union contract.**

*See Bell,* slip op. at 14-15, WL \*4 (quoting Senator David Jones, transcript of Regular Session of Twenty-First Legislature, Feb. 1, 1996, at 24 (emphasis added).)

As the Supreme Court has made clear, even local statutes which unquestionably set minimum labor standards can nevertheless be preempted if they do not treat non-union and union parties alike. Thus, even if the WDA could be characterized as a local minimum employment standards law, which it cannot, it is preempted because it was enacted with the intention of affecting, and in fact does affect, concerted action protected by section 7 of the NLRA. No judicial construction of the WDA's statutory language and legislative history is required on this point, since the Legislature has expressly stated that the WDA was designed and intended to affect the collective bargaining process. Again, the unequal treatment of non-union and union parties is patent on the face of the statute.

*Fort Halifax* was relied upon seven years later in *Livadas v. Bradshaw,* 512 U.S. 107, 129 L. Ed. 2d 93, 114 S. Ct. 2068 (1994). A California statute required all wages to be paid immediately upon discharge of an employee, and precluded any private contractual waiver of that right. Employing section 1983, Livadas challenged the California labor commissioner's policy of not enforcing her claim for immediate payment under the statute solely because she was a member of a union. California argued that the policy was intended to avoid preemption under section 301 of the Labor-Management Relations Act. The Supreme Court held that the policy was preempted because it prejudiced discharged employees

330

solely because they belonged to a union. This is what distinguished *Livadas* from *Fort Halifax*: the Maine law held not preempted in *Fort Halifax* "treated all employees equally, whether or not represented by a labor organization. All were entitled to the statutory severance payment, and all were allowed to negotiate agreements providing for different benefits." *Livadas*, 512 U.S. at 131.

The *Livadas* Court found the controversy before it to be "fundamentally" no different from the case of *Nash v. Florida Indus. Comm'n*, 389 U.S. 235, 19 L. Ed. 2d 438, 88 S. Ct. 362 (1967). *See Livadas* at 117. Florida had denied unemployment benefits to the plaintiff in *Nash* solely because she filed an unfair labor practice charge. *See Nash*, 389 U.S. at 237. The Court first noted that a private employer who discriminated against an employee for filing such a charge would itself be guilty of an unfair labor practice under section 8 of the NLRA. *Id.* at 238. The *Nash* Court then ruled that "coercive actions which the Act forbids employers and unions to take against persons . . . are likewise prohibited from being taken by the States. The action of Florida here, like the coercive actions which employers and unions are forbidden to engage in, has a direct tendency to frustrate the purpose of Congress" in enacting the National Labor Relations Act. *Id.* at 239.

A case can surely be made that the Territory's coercive action of enacting a statute which prohibits non-unionized private parties from contracting on substantive terms which go to the heart of their employment relationship would constitute an unfair labor practice under section 8 of the NLRA. It is not necessary for the Legislature's action to rise to this level, however. For in *Livadas*, the Supreme Court rejected a narrow reading of *Nash* which would have held that "the NLRA prohibits only state action closely analogous to conduct that would support an unfair labor practice charge if engaged in by a private employer." 512 U.S. at 118 n.12. Rather, the Court pointed out that "our cases teach that parallelism is not dispositive and that the [NLRA] sometimes demands a more scrupulous evenhandedness from the States." *Id.* Thus, even if it would not constitute an unfair labor practice for an employer or a union to coerce unionization in order to vary certain set grounds for discharge, such action by the Legislature in the form of the

331

WDA nevertheless frustrates Congress' goal of assuring voluntary unionism.

█ Addressing true minimum labor standard laws which treat all parties equally regardless of union status and allow all the equal right to "opt-out" by negotiating contracts for different benefits, the Livadas Court was careful to make clear that its opinion "cast no shadow on the validity of these familiar and narrowly drawn opt-out provisions." *Id.* at 132. In a footnote to this quoted statement, the Court observed that it did not "seem plausible to suggest that Congress meant to pre-empt such opt-out laws, as 'burdening' the statutory right of employees not to join unions by denying nonrepresented employees the 'benefit' of being able to 'contract out' of such standards." *Livadas*, 512 U.S. at 132 n.26.[13] This footnoted *dicta* must be read in the context of those same familiar laws setting narrow minimum employment standards. The *dicta*, therefore, is irrelevant to the provisions of the WDA, which are neither familiar nor narrowly drawn. The WDA is not a minimum standard. The WDA treats unionized and non-unionized parties unequally. The WDA was enacted with the specific intention of encouraging concerted action. Therefore, the WDA burdens section 7 rights and interferes with aspects of labor relations that Congress intended to be left unregulated.

A simple thought experiment will unmask the WDA as something more than a non-preempted local statute setting minimum labor standards "which affect union and nonunion employees

---

[13] The footnote referenced "Addendum B to Brief for Employers Group as Amicus Curiae. *See Livadas v. Aubry*, No. 92-1920, 1992 U.S. Briefs 1920 (October Term, 1993, March 15, 1994), available on LEXIS. The brief collects state statutes setting minimum standards with similar "opt-out" provisions and not the substantial, intrusive and clearly more than minimum interference of the WDA. The state statutes complied there included groupings of collective bargaining agreement ["CBA"] exceptions to provisions specifying: 1) The Time in which Employer Must Pay Wages or Benefits [the subject matter of the Livadas decision], 2) Maximum Hours or Overtime Pay, 3) Requirements for Meal or Rest Breaks, and 4) Exceptions to Mandated Group Health Care Insurance Policy Provisions. A fifth category of other exceptions included certain state statutes dealing with minimum wages, paid vacations, and workplace safety. The same analysis holds for the statute considered in *Viceroy Gold Corp. v. Aubry*, 75 F.3d 482 (9th Cir. 1996) (finding no preemption of statute setting maximum hours per day in mining industry unless modified by CBA) and the wage order considered in *National Broadcasting Co. v. Bradshaw*, 70 F.3d 69 (9th Cir. 1995) (finding no preemption of statute requiring double time for all hours in excess of twelve hours per day unless modified by CBA).

equally, and neither encourage nor discourage the collective-bargaining processes." *See Metropolitan Life*, 471 U.S. at 755. If one removed the authority of unionized parties to vary the statutory terms of discharge and applied the WDA equally to unionized parties, it is patent that an equally applied WDA would be preempted. Indeed, the courts have already held that the WDA is preempted from applying to union employees. The Territory cannot require a union to incorporate all of the provisions of the WDA in its collective bargaining agreement ["CBA"] because it would interfere with the employees' section 7 rights to bargain for terms of employment, such as termination, through a union.[14] Federal labor law preempts the Virgin Islands Legislature from dictating what grounds for dismissal must be included in a CBA. *See, e.g., Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 220, 85 L. Ed. 2d 206, 105 S. Ct. 1904 (1985) (holding that "when resolution of a state-law claim is substantially dependent upon analysis of the terms of an agreement made between the parties in a labor contract, that claim must either be treated as a § 301 claim, or dismissed as pre-empted by federal labor-contract law").

Since the Territory through the WDA forces substantive terms on non-unionized employers and employees which are fundamental to their employment relationship, and which it cannot impose on unionized parties, the WDA cannot be described as a local statute which merely sets minimum labor standards. By its disparate effect on union and non-union parties, therefore, the WDA impermissibly interferes with the freedom to engage or not to participate in concerted action and the general concept of voluntary unionism preserved by the national labor laws. Such disparate treatment in favor of unionization is precisely what the Legislature intended the WDA to effectuate.[15]

---

[14] *See Aristide v. United Dominion Constructors, Inc.*, 30 V.I. 224, 1994 WL 371406 (D.V.I. 1994) (dismissing wrongful discharge claims as preempted based on existence of CBA); *Joseph v. United Dominion Constructors, Inc.*, 30 V.I. 220, 1994 WL 371412 (D.V.I. June 20, 1994) (same); *Stafford v. Hess Oil V.I. Corp.*, 1998 V.I. LEXIS 10, 1998 WL 290237 (Terr. Ct. May 12, 1998) (same); *Charles v. Hyatt*, 27 V.I. 136 (Terr. Ct. 1992) (Hodge, P.J.) (reaching same result by applying the preemption doctrine of *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 3 L. Ed. 2d 775, 79 S. Ct. 773 (1959)).

[15] As discussed previously, the amendment was designed to require the involvement of a union in order to alter the statutory bases for discharge. "And this amendment simply

One final note. The intervenors attempt to restrict the coverage of the national labor laws and the application of *Machinists* preemption to labor relations only after the decision to engage in concerted action has taken place. This is the basis for the intervenors' mantra that the WDA does not have anything to do with the collective bargaining process covered by the NLRA. While most of the cases the Court relies upon here did indeed arise in the context of disputes involving unions, their members, and employers who were negotiating or disputing collective bargaining agreements, the principles to be gleaned from them apply to any activity protected by the NLRA. *See, e.g., Machinists,* 427 U.S. 132, 96 S. Ct. 2548, 49 L. Ed. 2d 396; *Metropolitan Life,* 471 U.S. 724, 85 L. Ed. 2d 728, 105 S. Ct. 2380; *Pattern Makers',* 473 U.S. 95, 87 L. Ed. 2d 68, 105 S. Ct. 3064; *Golden State I,* 475 U.S. 608, 89 L. Ed. 2d 616, 106 S. Ct. 1395; *Golden State II,* 493 U.S. 103, 107 L. Ed. 2d 420, 110 S. Ct. 444. Obviously, the decision whether or not to instigate or join a unionization effort is clearly protected by section 7. Indeed, it is the necessary first step in that process. The fact that no other state or territory has enacted a statute "which so radically rends the long-accepted concepts of employee-employer relationship as does the Virgin Islands Wrongful Discharge act" is no reason that the principles of these cases are not applicable to the WDA. *Bell,* slip op. at 11, WL *2.

Adriane J. Dudley, an attorney knowledgeable in labor relations in the Virgin Islands from the management point of view, testified at the hearing held May 7, 1999. Her information was that one of the ways an employer may legitimately seek to discourage union activity is to give preferential contracts to key employees, including special terms for discharge. The WDA deprives Virgin Islands employers of the economic tool of contracting to vary the permissible causes for discharge in exchange for some enhanced employee benefit, except when negotiated with a union. The WDA goes to the heart of voluntary unionism protected by Congress and violates national labor policy by denying employers this economic

---

attempt [sic] to clarify the code and say exactly what we mean, that any modification must come, it must be in a union contract. (Tr. of Regular Session of Twenty-First Legislature, Feb. 1, 1996, at 24.)

tool to legitimately influence the employer's initial decision to attempt to organize a union, or to choose not to do so.

## C. Meddling at the Heart

Montana's Wrongful Discharge from Employment Act, previously analyzed by this Court in *Bell*, slip op. at 9 n.9, WL *2 n.9, was at issue in *Barnes v. Stone Container Corp.*, 942 F.2d 689 (9th Cir. 1991). Mr. Barnes brought a claim of wrongful discharge against his employer, Stone Container Corporation, after he was fired during a bargaining impasse. Montana's act excluded employees covered by a collective bargaining agreement. The Barnes court viewed

> the imposition of a just cause term by the WDA on the parties negotiating a contract as **meddling at the heart of the employer-employee relationship** at a time when such interference is most harmful. Issues of hiring and firing are often central to CBA negotiations and the NLRA, as interpreted in *Machinists*, intended to allow the parties to resolve these matters without the unsettling effect of state regulation.

*Id.* (emphasis added).

While *Barnes* involved the active negotiation of a CBA, the principle applies equally to all the steps of voluntary unionization protected by the national labor policy in general, and section 7 in particular. Accordingly, this Court finds that the Virgin Islands WDA meddles at the heart of the employer-employee relationship, whether or not employers and employees are actively engaged in collective bargaining or unionization drives.

## D. Interstate Commerce

Respondents question whether federal labor policy preemption should apply to all employers in the Virgin Islands, or, for instance, only those of a certain size. The NLRA contains the usual commerce clause statement: "The term 'commerce' means trade, traffic, commerce, transportation or communication . . . within any Territory." 29 U.S.C. § 152(6) (emphasis added). Therefore, all com-

merce within the Territory of the United States Virgin Islands is in "interstate commerce."[16]

In light of the decision in *Bell*, these findings that employers have standing under the NLRA to raise these claims, that the WDA was intended to affect concerted action, that the WDA treats union and non-union parties differently, that the WDA is not a minimum employment standard, that the WDA meddles at the heart of labor relations, and that all commerce in the Virgin Islands is "interstate," the Court thus finds a probability of success on the merits.

## 2. *Irreparable Harm*

This is a section 1983 case. "[T]he inability to obtain damages from the State in a § 1983 action reduces the showing necessary to establish irreparable harm." *Rum Creek Coal Sales*, 926 F.2d at 360.

> The history of § 1983 demonstrates that a constitutional or federal statutory violation creates a special harm. Indeed, plaintiffs in § 1983 actions have not been required to exhaust state administrative remedies. . . .
>
> In addition, the conclusion that, in most circumstances, "the possibility that adequate compensatory or other corrective relief will be available at a later date . . . weighs heavily against a claim of irreparable harm," is not present here. . . . [Acting Commissioner Roberts] — [a] state official[] in her official capacity — can be enjoined under § 1983; but . . . probably cannot be sued for damages. No other form of redress appears available if the preliminary injunction is denied and, later on the

---

[16]One matter not raised by the parties is an explicit exclusion of certain employees from the definition of employees within the NLRA, namely, "any individual employed as an agricultural laborer, or in the domestic service of any family or person at his home, or any individual employed by his parent or spouse, or any individual employed as a supervisor, or any individual employed by an employer subject to the Railway Labor Act, as amended from time to time, or by any other person who is not an employer as herein defined." 29 U.S.C. § 152(3). Excluded from the term "employer" is "the United States or any wholly owned Government Corporation, or any Federal Reserve Bank, or any State or political subdivision thereof, or any person subject to the Railway Labor Act, as amended from time to time, or any labor organization (other than when acting as an employer), or anyone acting in the capacity of officer or agent of such labor organization." 29 U.S.C. § 152(2). Therefore, any preliminary injunction will not apply to these excluded employees.

merits, a constitutional violation is found to have occurred. Section 1983 limits remedies against the State, in the absence of congressional abrogation or the State's waiver of immunity, to injunctive and declaratory relief.

*Id.* at 361.

In short, plaintiffs have met their burden of establishing the likelihood of irreparable injury by showing violations of rights secured by federal law, that they cannot be compensated by money damages, and that the acting commissioner is "reasonably likely to continue those practices." *Zepeda v. I.N.S.*, 753 F.2d 719, 727 (9th Cir. 1983); *accord, Trans World Airlines v. Mattox*, 897 F.2d 773, 784 (5th Cir. 1990) (concluding that state regulation of an area preempted by federal law causes irreparable injury).

*3. Balance of the Hardships*

The balance of the hardships favors the plaintiffs. If the injunction does not issue, they will be forced to litigate claims before VIDOL under a statute which very probably is preempted under federal law. On the other hand, the government faces no hardship if enjoined. *See, e.g., Trans World Airlines*, 897 F.2d at 784 (finding no injury to state in enjoining it from regulating area preempted by federal law). The same applies to the intervenors. Even if they are currently unemployed, they will have their hearings if a permanent injunction does not issue, or if this Court is reversed by the United States Court of Appeals. If the intervenors are found to have been wrongfully discharged, they will be awarded whatever remedy is appropriate to their respective claims, which may include not only reinstatement, but also backpay for the entire period after their respective discharges.

Thus, the Court finds that the balance of the hardships favors the plaintiffs.

*4. Public Interest*

The Court finds that this factor is either neutral or favors the plaintiffs.

First, while the public has an interest in the executive agencies of the Virgin Islands enforcing arguably valid local laws, the public

also has an interest in its executive and legislative departments not violating federal law.

Second, the effect on employees is ambiguous. While respondents argue that a preliminary injunction will harm employees, plaintiffs argue that prospective employees stand to benefit if the choice is between hiring them for probationary periods or not hiring them at all.

While the wisdom of the Legislature's action in enacting the WDA is not a matter properly before the Court, nor is it any basis for finding the act preempted, the effect of the WDA on the public in general is properly considered in weighing the public interest in whether an injunction should issue.

Pursuant to a request by this Court during the pendency of the TRO, VIDOL provided this Court with its statistics for fiscal years ["FY"] 1996 to present.[17] In FY 1996 (October 1, 1995, to September 30, 1996), 294 wrongful discharge claims were filed, 162 were dismissed after a formal hearing, 75 were settled by mediation, 39 were voluntarily withdrawn, 12 were dismissed by default, 1 was dismissed due to bankruptcy. A total of 5 employees were granted formal relief by VIDOL, that is, reinstated with back pay. In FY 1997, of the 318 claims filed, 12 were reinstated with back pay. In FY 1998, of the 449 claims filed, 10 were reinstated with back pay.[18]

In summary, of the 1061 claims filed in the three full fiscal years of 1995-96, 1996-97, and 1997-98, only 27 claimants have been granted any formal relief by VIDOL, approximately 2.5%. Roughly seven times that number, 173, or 16%, were settled by mediation. A further 156 claims, or 15%, were voluntarily withdrawn, a number which VIDOL represents includes settlements reached outside of VIDOL's mediation. Since any preliminary injunction issued by this Court will permit VIDOL to continue its mediation services, the Court finds that the effect upon the general public is not enough to offset the harm to the plaintiffs.

---

[17] VIDOL's statistics are attached as Appendix A.

[18] Thus far in FY 1999, *i.e.*, from October 1, 1998 to May 18, 1999, 279 claims have been filed, and 16 claimants were reinstated with back pay. This year's figures have been distorted due to VIDOL's self-imposed stay following the Bell decision which lasted from mid-February to April 6th, the day the TRO was entered in this case.

Finally, in motions such as these, where the movant has shown a likelihood of success on the merits and irreparable injury, the public interest favors the preliminary injunction. *See American Tel. & Tel. v. Winback and Conserve Program, Inc.*, 42 F.3d 1421, 1427 n.8 (3d Cir. 1994).

■ The Court therefore finds that a preliminary injunction should properly issue. The Court will enjoin VIDOL from conducting any formal hearings based on the WDA for employees covered by the NLRA. The order will, however, allow VIDOL to continue to accept new complaints. It will also not enjoin any efforts that VIDOL may make to bring employers and employees together to voluntarily mediate discharge disputes.

**A Bond**

■ This Court must determine whether security is necessary pursuant to FED. R. CIV. P. 65(c). The plaintiffs have argued that no security need be posted, reasoning that if this Court should be found in error, or if it ultimately determines that a permanent injunction should not issue, then those former employees with valid wrongful discharge claims will be reinstated and get back pay. Respondents, though not suggesting an appropriate amount for security, have argued that employers may go out of business, leave the Territory, declare bankruptcy, or otherwise preclude any meaningful recovery. The Court finds that this is a valid concern, though unlikely to occur in a great number of cases. Therefore, the Court will require the plaintiffs to post a $25,000 bond to cover losses to any employee who may ultimately be awarded back pay under the WDA and find that he or she is unable to recover from the former employer.

## CONCLUSION

This Court will enjoin the Virgin Islands Department of Labor from conducting any formal wrongful discharge hearings regarding employees covered by the NLRA,[19] until this case is tried on the merits or otherwise resolved. The Department may, however,

---

[19] *See* note 16.

continue to accept complaints and conduct voluntary mediation. This Court will further order that the plaintiffs post a bond in the amount of $25,000 within ten days of the issuance of the accompanying order.

## ORDER

For the reasons set forth in the foregoing Memorandum, it is hereby

ORDERED that the Virgin Islands Department of Labor is ENJOINED from conducting any formal hearings on wrongful discharge complaints from employees covered by the NLRA[20] until such time as this Court is able to conduct a trial on the merits, at which time either the preliminary injunction will be lifted or a permanent injunction will issue. The Department may, however, continue to accept complaints and conduct voluntary mediation. It is further

ORDERED that the plaintiffs post a bond in the amount of $25,000 within ten days of the issuance of this order.

ENTERED this 2nd day of June, 1999.

---

[20] VIDOL is not barred from processing WDA complaints filed by agricultural laborers, domestic servants, employees of spouses or parents, supervisors, or those employed by the United States or the Government of the Virgin Islands. While there may well be defenses to the application of the WDA to these employees, that issue will not be decided at this time.

340

## VIRGIN ISLANDS DEPARTMENT OF LABOR
## STATISTICS FOR WRONGFUL DISCHARGE CASES
## BY FY OCTOBER 1 - SEPTEMBER 30

(REVISED 5/24/99)

| YEAR | NO. OF CASES FILED | DISMISSED AFTER FORMAL HEARING | SETTLED BY MEDIATION (*) | VOLUNTARY WITHDRAWAL | REINSTATED WITH BACK PAY (**) | DISMISSED BY DEFAULT/ BANKRUPTCY | CASES PENDING DECISION/ CONTINUED (***) |
|---|---|---|---|---|---|---|---|
| 1996 10/1/95 - 9/30/96 | STX - 108 STT - 186 / 294 | 162 | 75 | 39 | 5 | 12 Default 1 Bankruptcy / 13 | |
| 1997 10/1/96 - 9/30/97 | STX - 116 STT - 202 / 318 | 181 | 51 | 43 | 12 | 8 Default 23 Bankruptcy / 31 | |
| 1998 10/1/97 - 9/30/98 | STX - 100 STT - 349 / 449 | 295 | 37 | 74 | 10 | 28 Default 5 Bankruptcy / 33 | |
| 1999 10/1/98 - 9/30/99 cut off 5/18/99 | STX - 147 STT - 132 / 279 | 74 | 15 Settled by Mediation 83 Scheduled for Mediation 62 To Be Scheduled | 24 Withdrawals | 16 | 0 Default 5 Bankruptcy / 5 | 23 STX 3 STT / 26 |

See also following page.

Note: &ast; Of these matters pending for mediation per the Court's order:
- 46 are scheduled in STX beginning 5/24/99-6/4/99;
- 37 are scheduled in STT beginning 5/27-6/10/99; and
- 40 cases in STT and 22 in STX have not yet been scheduled.

&ast;&ast; The low reinstatement ratio is not in and of itself an indicator of the effectiveness of the process, as a vast number of the complainants do not seek reinstatement to their jobs. The settlements include partial or no back pay or back pay without reinstatement. The voluntary withdrawals includes settlements reached by parties outside of the Department of Labor.

&ast;&ast;&ast; 305 cases pending during FY 99, includes approximately 26 cases pending decisions from FY 98; Since the Court's decision in *Bell v. Chase* on February 11, 1999, a total of 148 wrongful discharge cases (64 on STX and 84 on STT) were filed; of that amount 75 were filed (50 in STT & 25 in STX), since the Court temporarily enjoined the Department of Labor from conducting hearings on April 6, 1999.