BUILDING TRADES EMPLOYERS' EDUCATIONAL ASSOCIATION; Action Electrical Contracting Co., Inc.; Blake Electric Contracting Co., Inc.; Eaton Electric, Inc.; Eugene Iovine, Inc.; Ferrara Electrical Corp.; Gilston Electrical Contracting Corporation; Global Electrical Cont. of Westchester, Inc.; Granna Electric Inc.; Interphase Electric Corp.; Star Brite Electric Corp.; Tap Electrical Contracting Service Inc.; Walton Electrical Construction Corp. and Building Trades Educational Benefit Fund, Plaintiffs–Appellants,

v.

James J. McGOWAN, Commissioner of Labor of the State of New York and the New York State Department of Labor, Defendants–Appellees.

Docket No. 01–7775.

United States Court of Appeals, Second Circuit.

Argued: March 11, 2002.

Decided: Nov. 20, 2002.

Alan M. Pollack, New York, NY (Felicia S. Ennis, Pollack & Greene, LLP, New York, NY; Steven Goodman, Roger Kaplan, Jackson, Lewis, Schnitzler & Krupman, Woodbury, NY, of counsel), for Plaintiffs–Appellants.

M. Patricia Smith, Assistant Attorney General, Labor Bureau, New York, NY, (Eliot Spitzer, Attorney General of the State of New York, Michael S. Belohlavek, Deputy Solicitor General, New York, NY, of counsel), for Defendants–Appellees.

Before: CARDAMONE, LEVAL, and SOTOMAYOR, Circuit Judges.

CARDAMONE, Circuit Judge.

In this appeal, we consider the impact of two federal labor law doctrines of preemption on the regulatory activities of a state agency. In April 1999 plaintiffs, an association of electrical contractors, its member contractors, and its educational benefit fund filed an application with the defendants, the New York State Department of Labor and its Commissioner (collectively defendant or State Labor Department), for registration of their apprenticeship training program (apprenticeship program or program). Defendant refused to process plaintiffs' application because in its view the application presents a legal question that can only be answered by the National Labor Relations Board (Board). Defendant believes, in other words, that federal labor law preempts it from taking any action at all.

In response to defendant's inaction, plaintiffs filed the instant suit in the United States District Court for the Southern District of New York (Mukasey, C.J.), under the federal Constitution's Supremacy Clause, U.S. Const. art VI, cl. 2, and 42 U.S.C. § 1983, seeking a declaratory judgment that defendant's failure to process plaintiffs' apprenticeship program application unlawfully interferes with plaintiffs' continuing negotiations with their employees' union over a collective bargaining agreement; and also seeking an injunction forcing defendant to process plaintiffs' application; and asking for compensatory and punitive damages, prejudgment interest, and attorneys' fees.

The State Labor Department thought it faced a dilemma in which either choice was not entirely satisfactory: acting will violate one labor law doctrine and failing to act will violate another. Defendant's solution was to take no action. There may be legal problems presented to a party for which sitting on one's hands waiting for nature to take its course is the best solution. This case is not one of them.

## BACKGROUND

### A. Apprenticeship Training Programs in General

An apprenticeship training program prepares individuals for jobs in certain skilled trades, including the electrical trade, where competence is acquired through hands-on experience, through training and work on the job. See N.Y. Comp.Codes R. & Regs. tit. 12, § 601.3(b), (d)(1). Such programs benefit apprentices and employers alike. Trainees learn needed skills, while employers gain access to a relatively cheap labor pool because apprentices are paid less than experienced journeymen. Taxpayers also benefit indirectly because public works contracts are awarded to the contractor that submits the lowest responsible bid, and contractors can reduce their labor costs by hiring apprentices. Lower labor costs lead to lower responsible bids,

which in turn lead to savings for the public fisc. New York's public policy officially recognizes the importance of apprenticeship training programs in meeting the state's labor needs and expanding the state's industrial economy. *See* N.Y. Lab. Law § 810 ("To these ends, it is the declared public policy of the state of New York to develop sound apprenticeship training standards and to encourage industry and labor to institute training programs.").

Pursuant to the National Apprenticeship Act of August 16, 1937, ch. 663, 50 Stat. 664 (codified as amended at 29 U.S.C. §§ 50–50(b)), the federal Department of Labor registers those programs that offer training to apprentices in certain skilled trades provided they meet certain eligibility criteria. *See Associated Builders & Contractors, Inc. v. Herman*, 166 F.3d 1248, 1251 (D.C.Cir.1999). Federal authority over the registration of a proposed apprenticeship training program in New York has been delegated to defendant New York State Labor Department. *See Joint Apprenticeship & Training Council of Local 363, Int'l Bhd. of Teamsters v. N.Y. State Dep't of Labor*, 984 F.2d 589, 591–92 (2d Cir.1993); *see also* 29 C.F.R. § 29.12 (2001) (providing for delegation of authority to qualified state agencies). These training programs do not need to be registered, but registration is desirable because it confers financial benefits. *Joint Apprenticeship & Training Council*, 984 F.2d at 591–92. According to the parties, only contractors who participate in a registered program may submit bids on certain New York public works contracts. Further, the parties have stipulated that a training program registered in New York is eligible for New York State Apprenticeship Related and Supplementary Instruction Program funding, which defrays up to 50 percent of the costs of an apprenticeship program.

Every program has a sponsor. A sponsor may be a single employer, a group of employers, or a joint committee composed of both labor and management representatives. *See* N.Y. Comp.Codes R. & Regs. tit. 12, § 601.3(b). Even when the workforce is represented by a labor union, that union need not participate in a training program in which the employer participates; that is, an employer with a unionized workforce is not limited to participating in jointly-sponsored programs. But, according to a state regulation, if a labor union is certified to represent an employer's bargaining unit employees, that union must at least be notified of—and in some cases approve—any program that the employer or employers' group seeks to have registered by the State Labor Department. *See id.* § 601.4(g). The training program at issue in this case is being sponsored by a group of employers whose employees are represented by a single union, so that union must be notified in some manner.

The dispute before us centers on the permissible interpretations of the state's union notification regulation, § 601.4(g) of Title 12 of New York's Compilation of Codes, Rules & Regulations, which states that

[u]nder a program proposed for registration by an employer or employers' association, where the standards, collective bargaining agreement, or other instrument provides for participation by a union in any manner in the operation of the substantive matters of the apprenticeship program, written acknowledgment by the union of the union agreement or "no objection" by the union to the registration is required. Where no such union participation is provided, the employer or employers' association shall simultaneously furnish to the union lo-

cal, if any, which is the collective bargaining agent of the employees to be trained, a copy of its application for registration and of the apprenticeship program. In addition, upon receipt of the application and apprenticeship program, the commissioner shall promptly send by certified mail to such union local another copy of the application and of the apprenticeship program, together with a notice that union comments will be accepted for 30 days after the date of the agency transmittal.

To paraphrase this regulation, the State Labor Department's union notification process depends on whether there exists any agreement or other instrument that provides for participation by a union in any manner in the operation of the apprenticeship program. If such an instrument exists, then the union must approve the registration of any employer-sponsored program; if no instrument exists, the union only needs to be given an opportunity to comment on the program prior to its registration. In the former case, the union essentially has a veto power over the registration of a program sponsored by the employer.

### B. History of Plaintiffs' Labor Relations

In many cases, the existence of an instrument that provides for union participation in a training program is obvious. Often, it takes the form of a collective bargaining agreement between the employer and the union that contains a clause regarding program sponsorship. The issue is complicated in the present case because of the particular status of the relations between the plaintiffs and the labor union representing the electricians and other bargaining unit employees.

With the exception of plaintiff Walton Electrical Construction Corp., all of the plaintiff contractors were members of the United Construction Contractors Association (now known as the United Electrical Contractors Association) (Association), a multi-employer association that engaged in collective bargaining on behalf of the member employers. For years the Association was party to a series of bargaining agreements with Local 363, International Brotherhood of Teamsters, Chauffeurs and Warehousemen (Local 363), the union representing the contractors' electricians and bargaining unit employees. The terms of those agreements provided for joint sponsorship of training programs. Thus, before the state could register any Association-sponsored program, the union had to approve it.

This situation changed when Local Union No. 3, International Brotherhood of Electrical Workers, AFL–CIO (Local 3) won a representation election among Association bargaining unit employees in October 1989 and was certified by the Board as the exclusive bargaining representative of those employees in February 1993. Even though a new union represented plaintiffs' employees, a year remained on the collective bargaining agreement between the Association and Local 363. Hence, until 1994, all of the terms of the Local 363 agreement—including the joint training program provision—were still in effect.

In late 1994 after the Local 363 agreement expired, Local 3 and the Association began negotiating for a new collective bargaining agreement. In June 1998 with no agreement having been reached, the Association backed out of the negotiations on behalf of its member contractors. It informed Local 3 that further discussions would have to proceed with each member contractor individually. In response, Local 3 filed an unfair labor practice claim with the Board, alleging that the Association and certain member contractors had

failed to bargain in good faith. The Board issued a complaint, and administrative proceedings are currently underway in that federal administrative agency.

### C. Plaintiffs' Past Experience with Apprenticeship Training Program Registration

For many years the Association and Local 363 jointly sponsored a state-registered training program. In April 1994 the defendant State Labor Department deregistered that program, and since then the Association has not participated in any registered programs. In addition to the application leading to the present action, there have been since April 1994 at least two attempts by individual Association members to register an employer-sponsored training program, neither of which was successful.

One of these earlier attempts was made by Eugene Iovine, Inc. (Iovine), one of the Association's member contractors. On May 31, 1996 Iovine filed an application with defendant to register its own employer-sponsored program. See Iovine v. Sweeney, No. 97 CV 0873, 1997 WL 124216, at *1 (E.D.N.Y. Mar.14, 1997). Defendant rejected the application because, among other things, Local 3 objected to the program. Id. Iovine challenged the rejection, first administratively and then in federal court, on the grounds that Local 3's permission was not required by the state regulation. Id. Iovine also alleged that the State Labor Department's interpretation of § 601.4(g) allows the union to block the registration of any employer-sponsored training program and thereby interferes with ongoing collective bargaining negotiations in violation of federal labor law. Accordingly, the substantive issue in Iovine—just as it is here—was whether § 601.4(g) may be interpreted to require union consent prior to registration of an employer-sponsored program if an expired bargaining agreement—one which has yet to be replaced—provides for union participation in such programs.

In Iovine's case, defendant stood by its initial determination denying Iovine's application. The federal district court denied Iovine's motion for a preliminary injunction, but did not reach the § 601.4(g) construction issue raised by Iovine. Id. at *2. Rather, the trial court ruled that regardless of whether Local 3's permission was required pursuant to § 601.4(g), the defendant had other reasons that provided adequate support for its refusal to register Iovine's training program. Id. After the district court's denial of the motion for a preliminary injunction, the parties agreed to discontinue the proceedings without prejudice.

### D. Prior Legal Proceedings

Plaintiffs initially filed their application for registration of their training program on July 8, 1998. Without waiting for defendant's response, plaintiffs filed suit in federal court a few days later. On July 21 defendant informed plaintiffs that the agency was currently reviewing the regulations applicable to program registration and had placed a moratorium on all applications until review was complete. As a consequence, the parties agreed to place the district court action on the suspense calendar. Once the moratorium was lifted, the plaintiffs resubmitted their application in the spring of 1999. In October 1999 defendant asked about the status of negotiations between the plaintiff contractors and Local 3. According to plaintiffs, the last negotiations had taken place in June 1998, and nothing had happened since then because the union had not responded to the contractors' subsequent request to negotiate.

On November 22, 1999 defendant informed plaintiffs by letter that in its view federal law preempted the processing of their application. Defendant stated that "where there is a dispute as to who is the duly constituted collective bargaining representative, or where a union and an employer dispute whether the terms and conditions of an expired collective bargaining agreement continue to apply, the [Board] has exclusive jurisdiction to determine such matters." Defendant was not sure whether the training program sponsorship clause of the expired collective bargaining agreement continued to apply, and therefore advised plaintiffs that it would hold their application in abeyance "[u]ntil those [ongoing collective bargaining] negotiations are completed." In a second letter to plaintiffs, dated December 2, 1999, defendant further explained that if "the [Board] resolves the issue of whether your application for an apprenticeship training program constitutes a unilateral change in the terms and conditions of a collective bargaining agreement," the application would be processed.

Plaintiffs then moved in district court for a preliminary injunction ordering defendant to process plaintiffs' application. The district court denied the motion, reasoning that plaintiffs had demonstrated neither irreparable harm nor a likelihood of success on the merits of their claim. It doubted the need for an immediate injunction, given that the Association and Local 3 had not engaged in any negotiations since June 1998 and that plaintiffs had not participated in a registered training program in more than six years.

On January 12, 2001 both sides moved for summary judgment. Plaintiffs argued that defendant's inaction itself violated federal labor law. Defendant contended it was preempted from processing plaintiffs' application by virtue of the National Labor Relation Board's primary jurisdiction. The district court ruled in favor of defendant. This appeal followed.

## DISCUSSION

### I Deference and Standard of Review

■ We defer to a state agency's interpretation of its own regulations, unless the interpretation is arbitrary or capricious. *See, e.g., Tommy & Tina, Inc. v. Dep't of Consumer Affairs*, 95 A.D.2d 724, 724, 464 N.Y.S.2d 132 (1st Dep't 1983), *aff'd*, 62 N.Y.2d 671, 476 N.Y.S.2d 290, 464 N.E.2d 988 (1984). But federal courts owe no deference to state agency's interpretation of federal law that they are not charged with enforcing. *Cf. Perry v. Dowling*, 95 F.3d 231, 236 (2d Cir.1996) (stating that when a state agency interprets a federal statute deference is not appropriate). In the instant case we have an unusually perplexing question to resolve because, rather than adopting an interpretation that plaintiffs can challenge outright, defendant has refused to interpret § 601.4(g) at all. Thus, although a state regulation is central to this case, we have no state agency construction of it to which we can defer. Instead, the agency's action (or more precisely, inaction) that plaintiffs challenge is based on the State Labor Department's interpretation of the National Labor Relations Act (NLRA or Act) as construed by the federal courts. Significantly, Congress has not entrusted enforcement of the NLRA to defendant State Labor Department and so we do not defer to defendant's interpretation of the NLRA.

■ We review a district court's summary judgment ruling *de novo, see, e.g., Mount Vernon Fire Ins. Co. v. Belize NY, Inc.*, 277 F.3d 232, 236 (2d Cir.2002), and affirm the grant of such relief only where no reasonable trier of fact could find for

the nonmoving party. *Taggart v. Time Inc.*, 924 F.2d 43, 46 (2d Cir.1991). Although we must interpret the facts in the light most favorable to the non-moving party, the facts in this case are not in dispute; rather, we are faced with two purely legal questions. We must decide if the district court erred in granting defendant's motion for summary judgment; if so, we must further consider whether it was error to deny plaintiffs' motion for the same relief.

## II Contentions of the Parties

As already stated, under § 601.4(g), if there is an existing collective bargaining agreement that "provides for" union participation in apprenticeship training programs, the union must be notified of the pending registration of an employer-sponsored program. In some cases, the employees' union must file a "no objection" letter with the state; in others, the union is only given notice and an opportunity to comment. The issue in the case at hand, as noted, is how to interpret this regulation when there is an *expired* bargaining agreement that provides for union participation in apprenticeship programs and the negotiations for a new labor agreement have not reached impasse.

Plaintiffs declare that one federal preemption doctrine—*Machinists* preemption—*compels* defendant to process their application. In response, defendant asserts that another preemption doctrine—*Garmon* preemption—*prevents* it from interpreting § 601.4(g), and that the plaintiffs' application must be held in abeyance until one of three conditions is met. Before setting out each party's position in more detail we describe these two preemption doctrines.

### A. Garmon *Preemption &* Machinists *Preemption*

■ *Garmon* preemption, the older of the two doctrines, derives its name from

*San Diego Building Trades Council v. Garmon*, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959), which held that states may not regulate behavior covered by § 7 or § 8 of the NLRA or behavior arguably covered by either of those two sections. *See also Belknap, Inc. v. Hale*, 463 U.S. 491, 498, 103 S.Ct. 3172, 77 L.Ed.2d 798 (1983) (articulating *Garmon* preemption boundaries). Sections 7 and 8 of the Act regulate "concerted activities" and "unfair labor practices," respectively, seeking to protect the former and stamp out the latter. 29 U.S.C. §§ 157, 158 (codifying § 7 and § 8 of the NLRA). *Garmon* preemption protects the Board's primary jurisdiction to decide what conduct is protected or prohibited in labor-management relations under the NLRA. Such preemption thereby assures a coherent national labor policy. *See Metro. Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 748, 105 S.Ct. 2380, 85 L.Ed.2d 728 (1985); *Sears, Roebuck & Co. v. San Diego County Dist. Council of Carpenters*, 436 U.S. 180, 187–88, 98 S.Ct. 1745, 56 L.Ed.2d 209 (1978); *see also Air Transp. Ass'n of Am. v. Prof'l Air Traffic Controllers Org.*, 667 F.2d 316, 323 (2d Cir.1981) ("*Garmon* rests primarily on the need to ensure a consistent body of federal labor law by preempting potentially inconsistent state court adjudication.").

The Supreme Court articulated the doctrine now known as *Machinists* preemption in *Lodge 76, International Ass'n of Machinists v. Wisconsin Employment Relations Commission*, 427 U.S. 132, 96 S.Ct. 2548, 49 L.Ed.2d 396 (1976). While *Garmon* preemption focuses on conduct arguably within the scope of § 7 or § 8 of the NLRA, this later form of preemption protects employers' and unions' use of "economic weapons" that Congress aimed for them to have freely available. *See id.* at 150–51, 96 S.Ct. 2548. Even though no

section of the NLRA expressly protects these economic weapons, they are integral parts of the legislative scheme and cannot be subject to regulation by the states or the courts or even the Board. The rationale behind *Machinists* preemption is that government interference with these economic weapons would upset the delicate balance of interests established in the NLRA. *See id.* at 149–50, 96 S.Ct. 2548. In the design and enactment of that Act, Congress assumed that employers and unions would engage in economic self-help to the extent that such conduct is not expressly prohibited. *Id.* at 146–47, 96 S.Ct. 2548. The Supreme Court has construed *Machinists* preemption broadly to bar state interference with conduct that Congress aimed to be unregulated in furtherance of "policies implicated by the structure of the [Act] itself." *Derrico v. Sheehan Emergency Hosp.*, 844 F.2d 22, 28 (2d Cir.1988) (quoting *Metro. Life Ins.*, 471 U.S. at 749, 105 S.Ct. 2380).

### B. *Parties' Preemption Arguments*

1. *Plaintiffs' Argument.* Plaintiffs do not dispute that Congress planned for program registration to be subject to regulation. Instead, they urge that the activity at issue is not training program registration, but rather ongoing collective bargaining negotiations. Plaintiffs point out that it was Congress' aim that collective bargaining take place in an environment free from state interference. *See NLRB v. Ins. Agents' Int'l Union*, 361 U.S. 477, 488, 80 S.Ct. 419, 4 L.Ed.2d 454 (1960). They contend that defendant's policy of abeyance interferes with ongoing collective bargaining negotiations to their disadvantage. Specifically, they complain that defendant has interfered with such negotiations by refusing to process plaintiffs' program registration application until at least one of three conditions is satisfied, *i.e.*, plaintiffs and Local 3 reach a settlement, or plaintiffs and Local 3 reach an impasse in negotiations, or the Board determines whether an employers' unilateral application for registration of a program, in the circumstances of the present case, is an unfair labor practice.

Because plaintiffs have a financial incentive in having their training program registered, they maintain that defendant's policy of abeyance pressures them to wrap up negotiations or bargain to the point of impasse. Although defendant asserts that it will process plaintiffs' application if the Board makes a dispositive ruling, a Board ruling is dependent, in the first instance, on the *union's* filing an unfair labor practice charge. Such a filing is most unlikely to occur given that defendant's moratorium policy gives the union advantageous leverage in its negotiations with plaintiffs.

■ 2. *Background for Defendant's Argument.* A state may not, of course, regulate conduct that is covered by—or even arguably covered by—§ 7 or § 8 of the NLRA. According to § 8(a)(5), it is an unfair labor practice for an employer to refuse to engage in collective bargaining with its employees' certified union. 29 U.S.C. § 158(a)(5) (codifying § 8(a)(5) of the Act). An employer commits this unfair labor practice by refusing to negotiate with its employees' certified union over mandatory subjects of collective bargaining. These mandatory subjects, listed in § 9(a) of the NLRA, are limited to "rates of pay, wages, hours of employment, or other conditions of employment." *Id.* § 159(a) (codifying § 9(a) of the Act). Any other subjects are permissive, that is, the parties may, but are not obliged to consider them during collective bargaining. *See Silverman v. Major League Baseball Player Relations Comm., Inc.*, 67 F.3d 1054, 1059 (2d Cir.1995).

■ In addition to a literal refusal to sit down at the bargaining table, an employer also violates § 8(a)(5) by unilaterally implementing a change in the workplace that implicates a mandatory subject of bargaining. *See NLRB v. Katz*, 369 U.S. 736, 743, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962). In other words, "[w]hen a collective agreement expires, an employer may not alter terms and conditions of employment involving mandatory subjects until it has bargained to an impasse over new terms." *Silverman*, 67 F.3d at 1059.

3. *Defendant's Argument.* We now turn to defendant's *Garmon* preemption defense. That defense unfolds as follows: As part of the training program registration process, the State Labor Department must notify the union of any employer-sponsored program registration applications. The union must approve such applications only if there exists an instrument that "provides for" union participation in apprenticeship programs. Here, there is no *current* labor agreement in effect between plaintiffs and Local 3, but the last expired agreement between plaintiffs and Local 3's predecessor union contained a clause providing for union participation in those programs.

The Board, which has primary jurisdiction over the issue, has never determined whether program sponsorship is a mandatory subject of bargaining. If program sponsorship is a mandatory subject of bargaining, then the training program provision from the expired labor agreement remains in effect (for the purposes of the NLRA) since collective bargaining negotiations have not reached an impasse. Consequently, the employer's unilateral attempt to register an employer-sponsored training program would be a refusal to bargain, which is an unfair labor practice. On the other hand, if program sponsorship is not a mandatory subject of bargaining then

the employer's attempt to register its program clearly is not an unfair labor practice.

On account of the *Garmon* preemption doctrine, defendant insists, it is for the Board to determine whether such sponsorship is a mandatory subject of bargaining or, more specifically, whether plaintiffs' attempt to register their program in this case is an unfair labor practice. Without such a ruling, defendant says it is unable to interpret § 601.4(g). Were defendant to send the application to the union for approval, that would amount to an impermissible state determination that program sponsorship is a mandatory subject of bargaining because that is the only reason why the expired contract's program provision would remain in effect. If the state agency instead only gives the union an opportunity to comment on the application, that would amount to an impermissible state determination that program sponsorship is not a mandatory subject of bargaining. Either way—defendant's argument concludes—the State Labor Department fears it would be deciding an issue reserved for the Board, and *Garmon* preemption forbids it from making such a decision.

## III   Analysis

### A.   Golden State *Guide*

■ At the outset we observe it was not part of Congress' plan for apprenticeship training program registration to go unregulated. After all, the National Apprenticeship Act conferred on the federal Department of Labor authority to promulgate regulations regarding apprenticeship training. The federal agency established a registration program for training programs to satisfy, in part, this congressional directive. As stated earlier, the U.S. Department of Labor delegated this authority in New York to the State Labor

Department. Yet, we do not agree with defendant's assertion that *Machinists* preemption does not apply simply because training program registration is a regulated activity.

With respect to the merits, we think this case governed by the Supreme Court's opinion in *Golden State Transit Corp. v. City of Los Angeles,* 475 U.S. 608, 106 S.Ct. 1395, 89 L.Ed.2d 616 (1986), which it closely tracks. There the Court concluded that government inaction that interfered with ongoing collective bargaining was prohibited by *Machinists* preemption. *Id.* at 619, 106 S.Ct. 1395. In *Golden State,* the plaintiff was a taxicab company engaged in collective bargaining negotiations with the union representing its drivers. *See id.* at 609–11, 106 S.Ct. 1395. The plaintiff's franchise had expired, and the Los Angeles city council conditioned the renewal of the plaintiff's franchise on the settlement of the collective bargaining negotiations. *Id.* at 611, 106 S.Ct. 1395.

The plaintiff in *Golden State* did not assert the city was preempted from regulating the taxicab industry, but rather contended the city could not use its power over the franchise to force an end to collective bargaining negotiations. *See id.* at 611–12, 106 S.Ct. 1395. In the same fashion, the present plaintiffs do not challenge defendant's union notification regulation, but insist instead that defendant is preempted from using its power over training program registration to bring about a premature end to ongoing collective bargaining negotiations.

We further think the State Labor Department's defense sounds similar to that raised by the City of Los Angeles in *Golden State* that "it was in a no-win situation: having not renewed the franchise and thus permitting it to lapse, it stands accused of favoring the union; had it granted the renewal, it would have been accused of favoring the employer." *Id.* at 619, 106 S.Ct. 1395. Unfortunately for defendant the Supreme Court rejected this precise argument explaining that

> the question is not whether the city's action favors one side or the other. Our holding does not require a city to renew or to refuse to renew any particular franchise. We hold only that a city cannot condition a franchise renewal in a way that intrudes into the collective-bargaining process.

*Id.*

To distinguish *Golden State,* defendant points out that the bargaining negotiations in the present case have stalled. The agency therefore maintains that its inaction, unlike the city's inaction in *Golden State,* cannot possibly intrude on the collective bargaining process. The district court found this argument persuasive. We do not.

Although it is true that negotiations have not occurred for several years, the process has not reached impasse. Thus, plaintiffs and Local 3 could resume actual negotiations at any time, at which point defendant's inaction will be as intrusive on the negotiations as the city's inaction was in *Golden State.* Hence, with due respect to the district court, we do not think the length of time elapsed since the last negotiations occurred is relevant for purposes of *Machinists* preemption.

In sum, we think defendant's refusal to act threatens to skew the collective bargaining process by placing economic pressure on plaintiffs. With the financial benefits of apprenticeship training program registration at stake, plaintiffs are being pressured to settle negotiations or to reach impasse. In effect, if plaintiffs want any action to be taken on their program registration application, they must put themselves in a position to be influenced by the

State Labor Department's inaction. Further, we believe a dispositive Board ruling—the only other occurrence that will spur defendant to act—is highly improbable under the present circumstances because of the unlikelihood of the union filing an unfair labor charge.

### B. *Defendant Entangling Itself in Federal Labor Policy*

■ The Board has never determined whether the sponsorship of apprenticeship training programs is a mandatory or permissive subject of bargaining. But we cannot agree that this compels defendant to refuse to interpret its own regulation. Ironically, we believe defendant's inaction, rather than its action, is barred by *Garmon* preemption. That is to say, defendant's inaction is preempted by the very same doctrine that it uses to justify that inaction.

Although defendant correctly observes that the Board may deem program sponsorship to be a mandatory term of bargaining, that possibility does not mandate the State Labor Department's policy of abeyance, which itself interferes with labor-management relations. Even were program sponsorship to be a mandatory term of bargaining, it still does not fall within the State Labor Department's responsibility to see to it that no unfair labor practice is committed by a party's unilateral application for program registration. *See Associated Builders,* 166 F.3d at 1256; *cf. Linn v. United Plant Guard Workers of Am.,* 383 U.S. 53, 66, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966) ("The Board would not be ignored since its sanctions alone can adjust the equilibrium disturbed by an unfair labor practice."). By refusing to apply § 601.4(g) out of concern that the Board may later rule that an expired bargaining agreement with a training program sponsorship provision is an existent labor agreement with a program sponsorship provision, defendant needlessly entangles itself in federal labor policy. It cannot, under *Garmon* preemption, entertain such an interpretation.

To see why we conclude *Garmon* preemption forbids defendant from interpreting § 601.4(g)'s reference to "standards, collective bargaining agreement, or other instrument" to include an expired agreement under the circumstances of this case, consider as an example a case like ours where the employer contends negotiations had reached an impasse, but the union disagrees. If defendant refuses to process the employer's unilateral application, that would be a determination that negotiations were not at an impasse; but if the state agency processes the application, that amounts to a determination that there was an impasse. Thus, were the employer and union to disagree whether an impasse has been reached, defendant would necessarily be interfering with labor-management relations regardless of whether it chose to act or not. Whatever the State Labor Department did, it would be deciding whether or not an impasse had been reached, which is an issue exclusively for the Board. Consequently, the *Garmon* doctrine preempts the Labor Department from interpreting § 601.4(g) to include an expired labor agreement as an existing instrument that provides for union participation in a training program.

Further, reading § 601.4(g) to include an expired agreement as an instrument that "provides for" union participation in programs would have a perverse effect on the likelihood that the Board would ever be asked to determine whether such sponsorship is a mandatory subject of bargaining. Although defendant contends that its inaction is required out of deference to the Board's primary jurisdiction, "[t]he primary-jurisdiction rationale justifies pre-

emption only in situations in which an aggrieved party has a reasonable opportunity either to invoke the Board's jurisdiction himself or else to induce his adversary to do so." *Sears, Roebuck & Co.*, 436 U.S. at 201, 98 S.Ct. 1745. Here, the union would be the aggrieved party, but as we said earlier, the union has no incentive to pursue an unfair labor practice claim with the Board. In fact, the union actually has an incentive to refrain from filing a claim with the Board. The union would not want to risk a Board determination that program participation is only a permissive subject of bargaining because that would give the union less leverage in negotiations with an employer who wants to register a program.

Accordingly, we hold that defendant's inaction in the circumstances of this case is preempted, both by *Machinists* and *Garmon* preemption. However, because the registration process consists of more than this one regulation, we do not hold that the State Labor Department must register plaintiffs' training program. Moreover, our holding does not require defendant to adopt any particular interpretation of § 601.4(g), but rather it bars the state agency from adopting one particular interpretation. That is, as a matter of federal law, an expired agreement cannot be an instrument that "provides for" union participation in training programs. Because defendant advances no other reason for refusing to process plaintiffs' application, we hold that the defendant must process the application. Again, we express no opinion on what the outcome of that process should be.

## CONCLUSION

For the reasons stated, we reverse the district court's grant of summary judgment to defendant and also reverse its denial of plaintiffs' motion for the same relief. This case is remanded to the district court for further proceedings consistent with this opinion.